1

2

3

4

5

6
                                                    The Honorable Ronald B. Leighton

7
### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON

8
### AT TACOMA

9

10
JOSEPH A. KENNEDY,                    No. 3:16-cv-05694-RBL

            Plaintiff,

11
  v.                              DEFENDANT BREMERTON SCHOOL
                                      DISTRICT'S RESPONSE TO

12
BREMERTON SCHOOL DISTRICT    PLAINTIFF'S MOTION FOR
                                      PRELIMINARY INJUNCTION

13
           Defendant.

14
                                    NOTED ON MOTION CALENDAR:
                                    September 16, 2016

15

16

17

18

19

20

21

22

23

24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR         **TIERNEY & BLAKNEY, PC**
PRELIM. INJ.                                 2955 80th Avenue SE, Suite 102
( 3:16-cv-05694-RBL)                         Mercer Island, WA 98040
                                             206-232-3074 (Phone)
                                             206-232-3076 (Fax)

# TABLE OF CONTENTS

Page

I. INTRODUCTION…………………………………………………………..1

II. COUNTER-STATEMENT OF FACTS……………………………………...2

III. ARGUMENT……………………………………………………………...3

    A. Standard for Preliminary Injunction…………………………………….6

    B. Kennedy has no clear chance of success on his §1983 claim regarding a 2016 Coaching job……………………………………………………………7

        1. The District did not act under color of law within the meaning of §1983.....7

        2. Kennedy cannot show the deprivation of a constitutional right…………..10

        3. *Pickering* Step Two: Kennedy's speech while on duty as a coach was speech as a public employee, not as a private citizen…………………….11

        4. *Pickering* Step Three: Kennedy's speech was not a factor in an adverse action…………………………………………………………………...16

        5. *Pickering* Step Four: The goal of avoiding an Establishment Clause violation justified the District's actions………………………………...17

            i. A reasonable fear of an Establishment Clause violation satisfies *Pickering* Step Four……………………………………………..17

            ii. Kennedy's prayers violated the Establishment Clause…………...19

        6. *Pickering* Step Five: The District had legitimate grounds to place Kennedy on paid administrative leave because he violated a clear directive from his employer……………………………………………23

    C. Kennedy will not suffer irreparable harm………………………………...23

    D. The balance of equities tips heavily in favor of the District………………...23

    E. A preliminary injunction is not in the public interest……………………24

IV. CONCLUSION……………………………………………………….....24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - i
( 3:16-cv-05694-RBL)

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074 (Phone)
206-232-3076 (Fax)

1

**CERTIFICATE OF SERVICE**

2        I certify under penalty of perjury under the laws of the State of Washington, I caused the

3    original of the foregoing document to be filed with the Clerk of the Court via electronic filing,

4    who will send notification of filing as follows:

5    Hiram Sasser                                      Rebekah Perry Ricketts
          SBA No. 24039157                                  SBA No. 24074883
6    Michael Berry                                     Benjamin D. Wilson
          SBA No. 24085835                                  SBA No. 24084105
7    FIRST LIBERTY INSTITUTE                           Bryan M. Clegg
     2001 West Plano Parkway, Ste. 1600                     SBA No. 24097506
8    Plano, TX 75075                                   GIBSON, DUNN & CRUTCHER LLP
     Tel: (972) 941-6162                               2100 McKinney Ave, Ste. 1100
9    Fax: (972) 423-6162                               Dallas, TX 75201
     hsasser@firstliberty.org                          Tel: (214) 698-3100
10   mberry@firstliberty.org                           Fax: (214) 571-2900
                                                       rricketts@gibsondunn.com
11                                                     bwilson@gibsondunn.com
                                                       bclegg@gibsondunn.com
12

13   Anthony J. Ferate                                 Jeffrey Paul Helsdon
          SBA No. 21171                                     WSBA No. 17479
14   FERATE PLLC                                       OLDFIELD & HELSDON, PLLC
     4308 Echohollow Trail                             1401 Regents Blvd., Ste. 102
15   Edmond, OK 73025                                  Fircrest, WA 98466
     Tel: (202) 486-7211                               Tel: (253) 564-9500
16   aj@feratepllc.com                                 Fax: (253) 414-3500
                                                       jhelsdon@tacomalawfirm.com
17

18

19        DATED this 12th day of September, 2016 at Mercer Island, Washington.

20                                    _Alyssa Au_ _____
                                      Alyssa P. Au
21                                    Tierney & Blakney, P.C., Legal Secretary

22

23

24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR          **TIERNEY & BLAKNEY, PC**
PRELIM. INJ. - 26                              2955 80th Avenue SE, Suite 102
(3:16-cv-05694-RBL)                            Mercer Island, WA 98040
                                               206-232-3074

## I.   INTRODUCTION

Plaintiff's motion for a preliminary injunction fails because it never even mentions, much less analyzes, 42 U.S.C. §1983, the basis on which it seeks injunctive relief. Joseph Kennedy's ("Kennedy") request for an injunction to place him on the District's 2016 coaching roster is entirely based on his §1983 claim that the Bremerton School District ("District") acted under color of law to retaliate against him by "firing" him for exercise of free speech rights. Plaintiff's Brief, p. 1, ln. 24. In reality, Kennedy was never fired. Like all coaches, his one-season contract expired at the end of the 2015 football season, and <u>all</u> of the District's seven coaching positions were posted open for applicants. Kennedy, as well as three other coaches, chose not to apply for a 2016 job. Thus, no action by a District policy maker – an essential element of a §1983 claim – proximately caused the injury for which Kennedy seeks injunctive relief. *See*, *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In the absence of an action by the District under color of law, there is no cognizable injury related to a 2016 coaching position, so a federal court has no jurisdiction to use its injunctive powers to control the District's hiring process.

Even if there were federal jurisdiction and a valid §1983 theory, Kennedy's free speech claim is otherwise fatally defective. Under *Garcetti v. Ceballos*, 547 U.S. 410, 421-22, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) and its progeny, a government employee whose speech "owes its existence" to his job has spoken as a public employee, not a private citizen, and his speech is not protected under the First Amendment. Since Kennedy argues that the District-provided context of his speech – on the 50-yard line, among the players, at the conclusion of a game – is absolutely essential to his speech, he spoke as a public employee outside of the First Amendment umbrella.

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - 1
(3:16-cv-05694-RBL)

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1    Additionally, Kennedy's free speech claim runs aground on the Establishment Clause.

2    As the District counseled him from the outset, its concern was not his prayer itself, but that the

3    time and place of the prayer would violate the Establishment Clause and subject the District to

4    liability. Since the District's concerns are well supported by established precedent, it acted

5    lawfully by seeking to relocate his prayer.

6    ## II.  COUNTER-STATEMENT OF FACTS

7    The Bremerton School District ("District") enrolls 5,057 students, has approximately 332

8    teachers, and 400 non-teaching personnel. Declaration of Aaron Leavell in Opposition to

9    Plaintiff's Motion for Preliminary Injunction ("Leavell Decl.") ¶ 3. The District employed

10    Joseph Kennedy ("Kennedy") as a football coach from 2008 until the 2015 season. In 2015 he

11    worked as an assistant coach for the varsity high school team and a head coach for the junior

12    varsity team under a one-season contract with a stipend of $4,498. Declaration of Garth

13    Steedman in Opposition to Plaintiff's Motion for Preliminary Injunction ("Steedman Decl.") ¶ 3.

14    The District did not learn of Kennedy's 8-year practice of praying with students before

15    and after football games until September 2015. Following an inquiry into the practice,

16    Superintendent Leavell sent Kennedy a letter on September 17 that cited several federal cases

17    and directed Kennedy to avoid demonstrative religious activity around the students.

18
19
20
21
22
> You and all district staff are free to engage in religious activity,
> including prayer, so long as it does not interfere with your job
> responsibilities. Such activity must be physically separate from any
> student activity, and students may not be allowed to join such
> activity. In order to avoid the perception of endorsement discussed
> above, such activity should either be non-demonstrative (*i.e.* not
> outwardly discernable as religious activity) if students are also
> engaged in religious conduct, or it should occur while students are
> not engaging in such conduct.

23    Declaration of Michael B. Tierney in Opposition to Plaintiff's Motion for Preliminary Injunction

24

1   ("Tierney Decl.") Ex. 12, p. 3; Ex. 10, p.2.

2       Because of the publicity the issue had received and due to comments posted on social

3   media, the District was concerned that possibly large numbers of members of the public would

4   come on to the field immediately following the game scheduled for September 18, some of them

5   with the intention of praying with Kennedy and football players. The District had not made

6   preparations for that type of crowd control situation. Consequently, in an email on September 18,

7   Superintendent Leavell told other administrators "we will not be able to prevent that from

8   happening" and "we will not create a scene at this event." Leavell Decl. ¶ 6; Tierney Decl. Ex.

9   11. This statement was directed only at the District's preparations for crowd control. The District

10  always had the authority to control its field and other facilities and had no intention of turning a

11  football game into an open public forum. Leavell Decl. ¶ 6; Tierney Decl. Ex. 10.

12      Contrary to Kennedy's allegation that the District later "changed the rules," Kennedy

13  <u>always</u> understood the September 17 letter from the District had directed him to cease praying on

14  the football field while the students were around – and he complied with that directive for several

15  weeks. Tierney Decl. Ex. 10. Then, on October 14, 2015, Kennedy's lawyer wrote the District,

16  seeking to be excused from the District's clear prior directions and specifically asking for an

17  accommodation that would allow Kennedy to pray on the 50-yard line immediately following a

18  game. Tierney Decl. Ex. 13. On October 16, without receiving the requested permission from the

19  District, Kennedy nonetheless proceeded on his own to violate the District's directive by

20  conducting a highly publicized prayer at the 50-yard line immediately following the game,

21  surrounded by kneeling players, kneeling citizens, and news cameras. Leavell Decl. ¶ 7; Tierney

22  Decl. Ex.1 (photo). In the process, a large number of people jumped the fence and otherwise

23  came on to the field. The District received complaints from parents of band members that they

24

TIERNEY & BLAKNEY, PC
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1    were knocked down as people rushed the field. Leavell Decl. ¶ 8.

2         The District wrote Kennedy again on October 23, 2015, reminding him that he was still

3    on duty as a coach immediately after the conclusion of games, that he had violated the District's

4    guidelines, that the District was willing to continue to confer with him and offer locations and

5    accommodations that would allow him to pray under circumstances that did not violate District

6    guidelines, and that the football field was not an open public forum. Tierney Decl. Ex. 14.

7              Thus, when you engaged in religious exercise immediately
              following the game on October 16, you were still on duty for the
8              District. You were at the event, and on the field, under the game
              lights, in BHS-logoed attire, in front of an audience of event
9              attendees, solely by virtue of your employment by the District. The
              field is not an open forum to which members of the public are
10             invited following completion of games; but even if it were, you
              continued to have job responsibilities, including the supervision of
11             the players… [A]ny reasonable observer saw a District employee,
              on the field only by virtue of his employment with the District, still
12             on duty, under the bright lights of the stadium, engaged in what
              was clearly, given your prior public conduct, overtly religious
13             conduct.…

14   Tierney Decl. Ex. 14, p. 2. Kennedy ignored the October 23 letter and proceeded to pray at the

15   50-yard line at the game that evening and again at the game on October 26. On October 28,

16   2015, the District wrote to Kennedy repeating its conclusion that he had violated District

17   directives on October 16, October 23, and October 26, and placed him on paid administrative

18   leave "pending further District review of your conduct." Tierney Decl. Ex. 15. After going on

19   administrative leave, Kennedy attended at least one game as a member of the public and prayed

20   in the stands with others and news cameras. Leavell Decl. ¶ 7; Tierney Decl. Ex. 2.

21        The District took steps to increase crowd control following the field rushing incident of

22   October 16. The District made arrangements with the Bremerton Police Department for security,

23   had signs made that the field was open only to authorized personnel, had "robocalls" sent to

24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - 4
(3:16-cv-05694-RBL)

TIERNEY & BLAKNEY, PC
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

District parents, and otherwise notified the public that the field was closed. Leavell Decl. ¶ 7.

Prior to one game, a group representing a "Satanist" religion stated that it would have a

ceremony on the field after the game if others groups were being allowed to. The group members

appeared at the facility in their regalia, but did not actually attempt to go on the field, which the

District had by then secured after games. Leavell Decl. ¶ 7; Tierney Decl. Ex. 3.

Evaluations of assistant coaches start with a written evaluation by the head coach, and

then by the Athletic Director, following which the assistant coach meets with the Athletic

Director to go over the evaluation. If the coach is unsatisfied with the evaluation, he or she can

request the involvement of the building principal and human resources personnel from the

District office. Steedman Decl. ¶ 4.  Kennedy did not participate in the evaluation process in

2015. The head coach filled out an evaluation form, dated November 12, and the Athletic

Director, also filled one out, which he signed December 16. Tierney Decl. Exs. 8, 9. However,

despite several requests, the Athletic Director was unable to get Kennedy to come in for a

conference. Kennedy also never proceed to the step beyond that, since he never requested the

involvement of the building principal or personnel from the District office. Steedman Decl. ¶ 5.

Following the 2015 season, the head football coach vacated the job. The District then

opened all seven of the football coaching positions for applications. The District filled the head

coach position first so that the new head coach could participate in the selection of assistant

coaches. It then filled all of the assistant coach positions with people who had applied for the

jobs. Of the seven coaches from the 2015 season, four coaches chose not to apply for positions in

2016, among them was Kennedy. Steedman Decl. ¶ 6.

One assistant coach who chose not to return was David Boynton. Steedman Decl. ¶ 7. He

is an ex-school board member, and has been known to Superintendent Leavell for at least 10

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - 5
(3:16-cv-05694-RBL)

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1   years. The first word that the District ever had about an alleged "Buddhist chant" by Boynton

2   was when it appeared in Kennedy's EEOC complaint in January 2016. The District has been

3   unable to confirm the existence of this alleged chant, and Superintendent Leavell has never

4   known Mr. Boynton to be a practicing Buddhist. Leavell Decl. ¶ 10.

## III.  ARGUMENT

### A.  Standard for preliminary injunction.

6          The Supreme Court has emphasized that preliminary injunctions are an "extraordinary

7   remedy never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d

8   249 (2008). A plaintiff seeking a preliminary injunction must show that: (1) she is likely to

9   succeed on the merits, (2) she is likely to suffer irreparable harm, (3) the balance of equities tips

10  in her favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 21. There are two

11  types of preliminary injunctions. A prohibitory injunction prevents a party from acting and

12  preserves the status quo, while a mandatory injunction "orders a responsible party to take

13  action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9[th]

14  Cir. 2009).  Requests for mandatory injunctions are subject to a higher standard than prohibitory

15  injunctions.[1]

16         In *Stanley v. University of Southern California*, 13 F.3d 1313 (9th Cir. 1994), Plaintiff

17  Stanley, the coach of the women's basketball team, was seeking to renew her contract after her

18  original contract expired. She alleged discrimination by the University, filed a lawsuit, and

19  moved for a preliminary injunction installing her as the coach of the team for the upcoming year.

---

[1] Plaintiff argues that an alternative test might apply, in which the first element of the *Winter* test is replaced with "serious questions going to the merits are raised," and the third element of the *Winter* test is replaced with "the balance of the hardships tips sharply in the plaintiff's favor." Plaintiff's Brief, p. 8. However, the "serious questions going to the merits" test does not appear ever to have been applied in the Ninth Circuit with respect to a mandatory injunction.

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - 6
(3:16-cv-05694-RBL)

TIERNEY & BLAKNEY, PC
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1    The Ninth Circuit affirmed the denial of the injunction, holding that Stanley was seeking a

2    mandatory injunction compelling the University to hire her after her contract had expired and, as

3    such, "her request was subject to a higher degree of scrutiny because such relief is particularly

4    disfavored under the law of this circuit." 13 F.3d at 1320, citing *Anderson v. United States*, 612

5    F.2d 1112, 1114 (9th Cir. 1979). Stanley therefore had to show a <u>clear</u> likelihood of success on

6    the merits. *Id.*  Kennedy's request is subject to heightened scrutiny as well. Like Stanley, his

7    coaching contract expired, he alleges discrimination against the school, and he seeks a

8    mandatory preliminary injunction giving him a job that has already been filled.

9    **B.  Kennedy has no clear likelihood of success on his §1983 claim regarding a 2016**

10   **coaching job.**

11       Kennedy seeks an injunction based solely on his §1983 claim for free speech retaliation.

12   Plaintiff's Brief, p.8, footnote 2. This Court's jurisdiction therefore depends upon the viability

13   and scope of the §1983 claim. There are two essential elements to a §1983 claim: (1) the

14   defendant must act under color of law, and (2) the defendant's conduct must deprive the

15   plaintiff of a constitutional right. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). Kennedy

16   can establish neither of these elements.

17       **1.    The District did not act under color of law within the meaning of §1983.**

18        A local government can incur liability under §1983 only for official policies, not on the

19   basis of *respondeat superior* liability for the actions of one of its employees. *Monell,* 436 U.S. at

20   691. A policy can come into existence by well-established custom or by the final decision of a

21   person with policy-making authority on the matter in question. *Jett v Dallas Indep. Sch. Dist.*,

22   491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). The policy in question must be the

23   moving force and proximate cause of the alleged injury. *Long v. County of Los Angeles*, 442 F.3d

24

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1178, 1186 (2006); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996). There must

be a "direct causal link between a municipal policy or custom and the alleged constitutional

deprivation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d

412 (1989). An intervening cause breaks the chain of causality and shields the government body

from liability under §1983. *Van Ort*, 92 F.2d at 837.  The policy requirement applies not just to

damage claims, but also to requests for injunctive relief under §1983. *Los Angeles County v.*

*Humphries*, 529 U.S. 29, 33, 131 S. Ct. 447, 178 L.Ed.2d 460 (2010).

      With respect to the first leg of Kennedy's §1983 claim – action by a defendant under

color of law – no District policy prevented Kennedy from coaching in 2016. His one-season

contract expired by its own terms at the end of the 2015 football season. The position of the

retiring head coach and all of the assistant coach positions were posted as open in 2016.[2] Nobody

at the District, much less a policy-maker, took any action on Kennedy's 2016 employment status

because he never applied for a job. His absence from the 2016 coaching roster is not proximately

caused by a District policy, but by his own inaction.

      Kennedy alleges two other adverse employment actions: his 2015 performance

evaluation, and his placement on paid administrative leave for the end of the 2015 football

season. Neither of these support a §1983 claim. The 2015 performance evaluation does not

constitute a final action by a District policy maker because an assistant coach, unhappy with his

evaluation by an Athletic Director, can bring the issue to the building principal and to personnel

from the District office. Steedman Decl. ¶ 4. Kennedy not only chose to refrain from asking a

higher-level official to review his evaluation, he did not even participate in the earlier-stage

review with the Athletic Director. Steedman Decl. ¶ 5. Since the 2015 performance evaluation

---

[2] Plaintiff cannot claim he did not know about the open positions, since his wife is the District's Human Resources Supervisor. Steedman Decl. ¶ 5.

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1   never reached the stage where it could constitute a final action by a District policymaker, it

2   cannot support a §1983 claim.

3        The paid administrative leave also fails to support Kennedy's claim, albeit for different

4   reasons. Paid administrative leave is a common practice in government agencies while they

5   conduct investigations of matters such as harassment, discrimination, or other employee

6   misconduct. *See Eklund v. City of Seattle Municipal Court*, 628 F.3d 473 (9th Cir. 2010)

7   (employee placed on paid leave during investigation of possible fraudulent behavior). While the

8   Ninth Circuit has decided paid leave can sometimes possibly be adverse employment action, it is

9   a fact specific inquiry. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013). In *Dahlia*, a

10  detective alleged that administrative leave caused him to miss the test for sergeant and cost him

11  holiday pay. As a matter of first impression, the 9th Circuit held these allegations were sufficient

12  to hold off a 12(b)(6) motion. Kennedy does not allege any such collateral effects from his

13  administrative leave and, without doubt, his leave did not affect his ability to pray at games from

14  the stands instead of the 50-yard line. Kennedy offers no basis to show a clear likelihood of

15  success in establishing that being paid <u>not</u> to coach constitutes an adverse employment action.

16       In the absence of District policy that would support a §1983 claim arising from Kennedy

17  not being hired to the 2016 coaching roster, this Federal Court has <u>no jurisdiction</u> to become

18  embroiled in a local school district's hiring decisions. Kennedy's request for a mandatory

19  preliminary injunction to force himself on to the 2016 payroll fails on this ground alone.

20  Moreover, the absence of a District policy regarding either the 2016 coaching roster or Plaintiff's

21  2015 performance evaluation, coupled with the absence of an adverse employment action with

22  respect to the paid administrative leave means Kennedy's <u>entire</u> §1983 claim rests on shaky

23  grounds and faces likely dismissal rather than success.

24

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1

2.      **Kennedy cannot show the deprivation of a constitutional right.**

2

No federal appellate court has ever held that teachers or coaches have a free speech right

3

to engage in demonstrative prayer while teaching or supervising students, and many cases have

4

held that no such right exists. Kennedy will be unable to fashion that right out of whole cloth in

5

this case. Kennedy's constitutional claim for free speech retaliation is subject to what is referred

6

to as the *Pickering* test,[3] under which the claim must successfully proceed through each of five

7

sequential steps, four of which it clearly fails. These steps are:

8
9
10
11

> (1) Whether the plaintiff spoke on a matter of public concern; (2)
> whether the plaintiff spoke as a private citizen or public employee;
> (3) whether the plaintiff's protected speech was a substantial or
> motivating factor in the adverse employment action; (4) whether
> the state had an adequate justification for treating the employee
> differently from other members of the general public; and (5)
> whether the state would have taken the adverse employment action
> even absent the protected speech.

12

*Johnson v. Poway Unified School Dist.*, 658 F.3d 954, 961 (2011). A plaintiff's failure to satisfy

13

a single step is fatal to the claim. *Johnson*, 658 F.3d at 961-62; *Coomes v. Edmonds School Dist.*

14

*No. 15*, 816 F.3d 1255, 1260 (9th Cir. 2016) (Failure to meet the second element of the *Pickering*

15

test required dismissal of plaintiff's claim because the First Amendment does not protect speech

16

by public employees that is made pursuant to their employment responsibilities). The District's

17

arguments focus on elements two, three, four and five of the *Pickering* test.

18

/

19

/

20

21

---

22

[3] While modified by other cases such as *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689

23

(2006), the multi-step test is typically referred to as the *Pickering* test, after *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - 10
(3:16-cv-05694-RBL)

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

3.     ***Pickering* Step Two: Kennedy's speech while on duty as a coach was speech as a public employee, not as a private citizen.**

The Ninth Circuit has ruled definitively that speech by school district employees, while on duty, is the speech of a public employee and not that of a private citizen. In *Johnson*, the plaintiff, a high school calculus teacher, hung banners in his classroom that emphasized religion. When the school district ordered him to take them down, he sued alleging infringement of his free speech rights. Johnson contended the banners constituted speech in his capacity as a private citizen. The court of appeals rejected this argument in an extensive analysis that goes to the heart of the arguments in the case at bar. *Johnson*, 658 F.3d at 966-70. The court framed the issue as an inquiry into whether Johnson's speech "owes its existence" to his position as a teacher, and was therefore not protected by the First Amendment. 658 F.3d at 966 (citing *Ceballos* 527 U.S. at 421-22). The court concluded that Johnson's religious speech was intricately connected to his public employment, reversed the district court's summary judgment in favor of the teacher, and ordered judgment in favor of the school district. *Johnson*, 658 F. 3d at 961, 968-70.

The court began by employing the analysis set forth in *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) to examine the public/private speaker issue. The *Eng* analysis consists of two stages. First, "a factual determination must be made as to the scope and content of a plaintiff's job responsibilities," and "second, the ultimate constitutional significance of those facts must be determined as a matter of law." *Johnson*, 658 F.3d at 966. The court's first-stage factual inquiry noted that Johnson's speech took place "squarely within" the performance of his ordinary job duties – teaching math – as opposed to something unique such as running errands for the school.

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

Of even more significance to the factual analysis, the court emphasized the central role that expression plays in the employment of teachers.

> More importantly, we recognize that "[e]xpression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary."

*Id*. at 967 (quoting *Mayer v. Monroe County Community School Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (Teacher did not speak as private citizen when advocating anti-war position in her classroom)).

In the second stage of the *Eng* inquiry – summarizing the constitutional significance of the facts – the court held that "Johnson's speech owe[d] its existence to his position." *Johnson*, 474 F. 3d at 967. The court pointed out that a private citizen would not even have been on the premises in the classroom, much less engaged in expressing his personal ideas. *Id*. The court emphasized that the role of a teacher was seamless, and could not easily be stepped out of during the school day. In drawing its conclusion, the *Johnson* court announced a rule of general application to school teachers:

> [T]eachers do not cease acting as teachers each time the bell rings or the conversation moves beyond the narrow topic of curricular instruction… Rather, because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers *necessarily* act as teachers for the purpose of a *Pickering* inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official.

*Id*. at 967-68 (emphasis in original). Since Johnson did not speak as a private citizen, he could not pass the second step of the *Pickering* test and his free speech claim failed. *Id*. at 970.

The *Johnson* court followed clear Ninth Circuit precedent as well as similar rulings from other circuits. In *Peloza v. Capistrano Unified School Dist.*, 37 F.3d 517 (9th Cir. 1994), a

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1   school district ordered Peloza, a high school teacher, to cease discussing religion with students

2   at any point while on campus, even outside of class time and even if the students initiated the

3   discussion. *Id.* at 519. The *Peloza* court found that, even outside of the classroom, the plaintiff

4   spoke as a teacher, not as a private citizen.

> While at the high school, whether he is in the classroom or outside
> of it during contract time, Peloza <u>is not just any ordinary citizen.</u>
> <u>He is a teacher</u>. He is one of those especially respected persons
> chosen to teach in the high school's classroom. He is clothed with
> the mantle of one who imparts knowledge and wisdom. His
> expressions of opinion are all the more believable because he is a
> teacher. The likelihood of high school students equating his views
> with those of the school is substantial. To permit him to discuss his
> religious beliefs with students during school time on school
> grounds would violate the Establishment Clause of the First
> Amendment…

11   *Id*. at 522 (emphasis added). In *Grossman v. South Shore Public School Dist.*, 507 F.3d 1097

12   (7th Cir. 2007), the Seventh Circuit held that a school district could properly refuse to rehire a

13   high school counselor because of her practice of praying with students. The court found that

14   "[s]taff that interact with students play a role similar to teachers" and that it was clear that

15   schools can forbid teachers from praying with students. *Id*. at 1100. In *Mayer*, the Seventh

16   Circuit rejected a high school teacher's claim that she was retaliated against for speaking against

17   the Iraq war during class time. The court ruled that the teacher had spoken as a public employee,

18   not as a citizen, reasoning that her speech at work was the very thing that the school had

19   contracted to control since "teachers hire out their own speech and must provide the service for

20   which employers are willing to pay." *Id*. at 479. In *Doe v. Duncanville Independent School*

21   *Dist.*, 70 F.3d 402 (5th Cir. 1995), the Fifth Circuit upheld an injunction preventing coaches

22   from leading, encouraging, promoting, or participating in prayers with players before, during, or

23   after sporting events, rejecting the argument that it infringed on the free expression rights of

24

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1   school district employees. *Id*. at 405. The court reasoned that coaches and school employees are

2   present at sporting events "as representatives of the school and their actions are representative of

3   [school district] policies." *Id*. at 406.

4       The reasoning of *Johnson*, *Peloza*, *Mayer*, *Grossman* and *Duncanville* applies squarely

5   to Kennedy's role as a football coach. The temporal scope of Kennedy's duties is beyond

6   dispute. Tierney Decl. Exs. 6, 7, 14. As explained by his employer, the District, Kennedy's job

7   duties did not cease at the final whistle of a game. [4] The District's position was entirely in

8   keeping with, and in fact demanded, by Washington law. A school stands in *loco parentis*, in

9   place of the parents, when children are entrusted to its care. *McLeod v. Grant County School*

10  *Dist. No. 128*, 42 Wn.2d 316, 319-20, 255 P.2d 360 (1953). This duty of care extends to

11  students engaged in sports and other school-sponsored activities. *Wagenblast v. Odessa Sch.*

12  *Dist. No. 105*, 110 Wn.2d 845, 856, 758 P.2d 968 (1988) ("As a natural incident to the

13  relationship of a student athlete and his or her coach, the student athlete is usually placed under

14  the coach's considerable degree of control."). Even after the end of a game Kennedy remained

15  responsible for supervising the players, following up on the care of injuries, securing equipment,

16  and maintaining order, among numerous other responsibilities of a coach.

17      The factual analysis of Kennedy's situation is parallel to the teacher in *Johnson*. The

18  teacher undertook his speech "squarely within" the performance of his duties – teaching math in

19  a classroom. *Johnson* at 967. Kennedy's speech took place squarely within the coaching

20  equivalent – coaching football on a field. The Poway District contracted with the teacher to

---

22  [4] Kennedy mistakenly identifies the District's discussion of the continuing nature of his job duties as a pretextual
23  attempt to show that his speech was disruptive. Plaintiff's Brief, pp. 15-16. In fact, the District was trying to show
    Kennedy that he was still on the job when he prayed, still subject to directives from his employer, and not able to
24  engage in speech as a private citizen.

DEFENDANT'S RESPONSE TO PL'S MTN. FOR             **TIERNEY & BLAKNEY, PC**
PRELIM. INJ. - 14                                 2955 80th Avenue SE, Suite 102
(3:16-cv-05694-RBL)                               Mercer Island, WA 98040
                                                  206-232-3074

1    obtain the entirety of his expressions with the students (*Id.* at 967-68), and the Bremerton

2    District contracted for the entirety of Kennedy's expressions with the student-athletes. The legal

3    conclusions to be drawn from these facts are likewise identical. Just as the teacher owed his

4    very presence in the classroom to his job, and with it his opportunity to speak, Kennedy owed

5    his very presence on the football field to his job. Just as no private citizen had the right to come

6    in and hang banners in the classroom, no private citizen had the right to lead the athletes on the

7    field in prayer. The *Johnson* court's conclusion that "Johnson's speech owes its existence to his

8    position" (*Johnson*, 474 F. 3d at 967) is equally applicable to Kennedy.

9          Accordingly, the word "coaches" should be added to the rule announced in *Johnson* (*Id.*

10   at 967-68). The new rule should read: "Because of the position of trust and authority they hold

11   and the impressionable young minds with which they interact, teachers <u>and</u> <u>coaches</u> *necessarily*

12   act as teachers <u>and</u> <u>coaches</u> for the purpose of a *Pickering* inquiry when at school or a school

13   function, in the general presence of students, in a capacity one might reasonably view as

14   official." When Kennedy prayed at the 50-yard line, at a District event, in his coaching gear,

15   wearing school insignia, with students close by, while on the District payroll and while still on

16   the job, he prayed as a public employee – his speech was not protected by the First Amendment.

17         Kennedy's argument that he spoke as a private citizen (Plaintiff's Brief, pp. 10-12)

18   essentially amounts to saying "Since my employer told me I could not pray at the 50-yard line, I

19   must have been acting as a private citizen when I did." Kennedy's argument proves only that he

20   knew he was defying a direct order, not that his defiance somehow momentarily transformed

21   him into a private citizen, only to quickly revert back to his employment as a coach. Indeed, if

22   Kennedy's theory of marvelous transformation were true, it would entirely swallow the second

23

24

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

step of the *Pickering* test because every item of employee speech contested by the government would automatically become speech by a private citizen.

Kennedy does not and cannot make any showing as to what mechanism allows him to switch himself into a private citizen and then back into a public employee against the wishes of his employer. There is no term of his contract, element of his job description or principle of employment law that gives him the authority to step outside of his duties at the time and place of his choosing. Kennedy's contention that he spoke as a private citizen is also extinguished by the very relief he seeks. If it is simply private-citizen speech Kennedy wants to undertake, why does he need the public stadium, the bright lights, the 50-yard line, the proximity of the students, the school insignia on his chest, etc.? Clearly, this lawsuit lacks candor – Kennedy seeks nothing less than to force the District to accept prominent prayer at a District event by an on-duty employee. The law would be turning a blind eye if, looking at the photo of Kennedy praying on the field (Tierney Decl. Ex. 1), it found that a high school coach, praying next to players after a game, was not a coach at all in that moment, but just a private citizen.

### 4.     *Pickering* Step Three: Kennedy's speech was not a factor in an adverse action.

As described in Section III.B.1, there are no adverse actions attributable to the District. There was no District policy concerning either a 2016 coaching job or the 2015 performance evaluation, and thus no District liability under §1983. The paid administrative leave was not an adverse action because there were no collateral consequences, and Kennedy continued to pray in the stands.  Since there was no District involvement in an adverse action, Kennedy cannot show a clear likelihood of success on this element.

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

Moreover, Kennedy entirely misses the crux of this element of the test. There is no evidence the District cared about the speech itself – his prayers – and Kennedy never offers any. The District repeatedly told him it had no opposition to him praying, it proposed places for him to pray, and it continually offered to discuss other solutions. Every bit of the evidence shows the District cared <u>only</u> about the time and place of the prayers, and then <u>only</u> because those circumstances risked an Establishment Clause violation. Kennedy says this is a pretext, but a pretext for what? Does he seriously rely on his red-herring innuendo that the District, where his wife is an administrator, is pro-Buddhist and anti-Christian? If so, what proof does he offer? The District never knew about the alleged Buddhist chant, Kennedy never mentioned it, and Coach Boynton is not known to be Buddhist. Leavell Decl. ¶ 10. In the absence of any proof, or even a rational theory, Kennedy has no likely chance of proving the District's motivation was anything other than what is stated in the District's letters – a legitimate fear of an Establishment Clause violation. Kennedy doubts there was such a risk, but he offers nothing to show the District did not truly form the good faith legal opinion that the risk existed.

In the District's sincere opinion, when Kennedy violated the District's clear directions, the issue wasn't his prayer, but the fact he had created a risk of liability to the District and was being insubordinate. There is no proof of any other motivation.

   **5.**   ***Pickering* Step Four: The goal of avoiding an Establishment Clause violation justified the District's actions.**

      **i.**   **A reasonable fear of an Establishment Clause violation satisfies *Pickering* step four.**

Avoiding an Establishment Clause lawsuit is a legitimate governmental interest that as a matter of law justifies the District's restrictions on Kennedy's conduct – and that is true even if

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

this Court ultimately finds that Kennedy's conduct would not have violated the Establishment Clause. *See, e.g., Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Duncanville*, 994 F.2d at 166. Because the District has a "legitimate interest…in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation," the District "must be accorded some breathing space to regulate in this difficult context." *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 475-77 (2d Cir. 1999). "School officials who exercise judgment based on their expertise and authority should be afforded leeway in making choices designed to foster an appropriate learning environment and further the educational process." *Walz ex rel. Walz v. Egg Harbor Twp. Bd. of Educ.*, 342 F.3d 271, 280-81 (3d Cir. 2003). The "school district's interest in avoiding an Establishment Clause violation trump[s] the teacher's right" to engage in religious conduct that implicates potential constitutional concerns, because the District cannot be required precisely to "navigate[] between the Scylla of not respecting its employee's right to the free exercise of his religion and the Charybdis of violating the Establishment Clause of the First Amendment by appearing to endorse religion." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 646, 650 (9th Cir. 2006); see also *Peloza*, 37 F.3d at 522.

The pertinent question here is not whether the District's Establishment Clause analysis was correct. The question instead is whether the District reasonably concluded that Kennedy's resumption of his prayers at the 50-yard line could expose the District to risks of litigation and liability for violating the Establishment Clause. Since, as explained below, the District's conclusion was more than reasonable, Kennedy has no chance of prevailing on this element.

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

ii.     **Kennedy's prayers violated the Establishment Clause**.

Under every test the Supreme Court has provided for evaluating Establishment Clause claims—the endorsement test, the coercion test, and the *Lemon* test —Kennedy's resumption of his prayers violated the Establishment Clause.

<u>Endorsement Test</u>. Official action unconstitutionally endorses religion when it "convey[s] or attempt[s] to convey a message that religion or a particular religious belief is favored or preferred." *County of Allegheny v. ACLU*, 492 U.S. 573, 593, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" *Santa Fe Indep. Sch. Dist.*, 530 U.S. 290, 309-10, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (citation omitted). Hence, the principal constitutional question here is not what Kennedy intended to accomplish, but what message Kennedy's resumption of his prayer practice would convey to a reasonable, objective student observer on the football squad or in the stands. *See id*. at 308 (prayers at high-school football games evaluated from perspective of objective student observer familiar with "implementation of" pregame-prayer practice); *Cf. Borden*, 523 F.3d at 178 (legal question is "whether a reasonable observer would perceive [coach's] actions as endorsing religion, not whether [coach] intends to endorse religion.").

Students witnessing Kennedy's demonstrative religious exercise on the field (Tierney Decl., Ex. 1) would perceive the message that Kennedy, and hence the school, was endorsing and putting its imprimatur on the prayer. *See id*. ("a reasonable observer would conclude that [coach] is showing not merely respect when he bows his head and takes a knee with his team

and is instead endorsing religion"); *Duncanville* 70 F.3d at 406 n.4. ("if while acting in their

official capacities, [school] employees join hands in a prayer circle or otherwise manifest

approval and solidarity with student religious exercises, they cross the line between respect for

religion and endorsement of religion."). The message is even more evident when viewed in its

necessary historical context because under the endorsement test the hypothetical student

observer would be presumed to know and consider "all of [Kennedy's] prior prayer activities

with his team." *Borden*, 523 F.3d at 176, 178-79 (coach's former leading of prayer meant that

students would understand taking a knee for student prayer to be continuation of past

unconstitutional endorsement of religion); *see also Santa Fe*, 530 U.S. at 308-09 (given

evolution of school's policy, "and in light of the school's history of regular delivery of a

student-led prayer at athletic events, it is reasonable [for an objective student] to infer that the

specific purpose of the policy was to preserve a popular 'state-sponsored religious practice.'").

      <u>Coercion Test</u>. Although official conduct need not be coercive to violate the

Establishment Clause (*Sch. Dist. Of Abington Twnsp. v. Schempp,* 374 U.S. 203, 221, 223, 83

S.Ct. 1560, 10 L.Ed.2d 844 (1963)), even subtle, inadvertent religious coercion of students by a

public-school official suffices to invalidate a prayer practice (*Lee v. Weisman*, 505 U.S. 577,

592-93, 599, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)). Recognizing that "there are heightened

concerns with protecting freedom of conscience from subtle coercive pressure," including peer

pressure, "in the elementary and secondary public schools," the Supreme Court in *Lee v.*

*Weisman* struck down prayer at public-school graduations because "prayer exercises in public

schools carry a particular risk of indirect coercion." 505 U.S. at 592, 595. Although the

graduation ceremonies in *Lee* were voluntary, the Court recognized that, "[t]o say that a student

must remain apart from the ceremony at the opening invocation and closing benediction is to

risk compelling conformity in an environment . . . where . . . the risk of compulsion is especially high." *Id*. at 596. In *Santa Fe*, the Supreme Court went further, holding that even "student-led, student-initiated prayer at football games violates the Establishment Clause." 530 U.S. at 311. As the Court explained: "There are some students," including "the team members themselves, for whom seasonal commitments mandate their attendance." *Id*. at 311. And even for those students who are not required by the school to attend: "To assert that high school students do not feel immense social pressure, or have a truly genuine desire, to be involved in the extracurricular event that is American high school football is 'formalistic in the extreme.'" *Id*. (quoting *Lee*, 505 U.S. at 595). "[G]iven our social conventions, a reasonable dissenter [at a school football game] could believe that the group exercise" of standing or remaining silent during the prayer "signified her own participation or approval of it" (*Lee*, 505 U.S. 593). That is unconstitutional religious coercion to engage in prayer. Hence, because the students in *Santa Fe* were faced with the choice of (a) participating in unwanted prayer, or (b) singling themselves out to coaches, teachers, and peers as religious dissenters, or (c) having to avoid the football games altogether, the Court held that even the student-initiated, student-led prayers "ha[d] the improper effect of coercing those present to participate in an act of religious worship." *Id*. at 312. The Establishment Clause does not permit teachers, coaches, or other school officials 'to exact religious conformity from a student as the price of joining her classmates at a varsity football game' – or any other "traditional gathering[] of a school community." *Id*. at 312; *see also,* e.g., *Borden*, 523 F.3d at 182-83 (McKee, J., concurring). Team members know that the coach decides "who plays and for how long, placing a disincentive on any debate with the coach's ideas." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1190 (6th Cir. 1995).

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1    Kennedy's practice of prayer on the field does not differ substantially from and

2    produced just as much coercive influence as any of the other practices that have been barred.

3    The unspoken pressure on the players is shown in the fact that players prayed when Kennedy

4    did, but in the period when he refrained from prayer, the players did not pray on their own.

5    Leavell Decl. ¶ 9. His practice therefore fails the coercion test.

6    _Lemon_ Test. "To withstand an Establishment Clause challenge," school officials'

7    conduct "(1) must have a secular purpose" and it also "(2) must, as its primary effect, neither

8    advance nor inhibit religion…." *Peloza*, 37 F.3d at 520 (citing *Lemon v. Kurtzman*, 403 U.S.

9    602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). For all the reasons that Kennedy's conduct

10   violated the endorsement and coercion tests, and more, Kennedy's conduct would violate both

11   the secular-purpose and secular-effect requirements of the *Lemon* test. Whatever the purposes

12   for prayer generally, the primary purpose for the practice of demonstrating prayers to the team,

13   on the fifty-yard line, immediately after the games, while wearing the coach's uniform and

14   supervising the students can only reasonably be thought to be to advance religion as a school

15   coach. And the primary purpose of adopting that practice after having been ordered to stop

16   delivering pregame team prayers and post-game religious speeches can only be thought to be to

17   continue to advance religion. *See, e.g.*, *Jager v. Douglas Cty. Sch. Dist.*, 862 F.2d 824, 830

18   (11th Cir. 1989) (holding that because school district refused to adopt modified pregame-

19   invocation practice that would still have accomplished district's asserted secular aims, "it is

20   clear that the School District was most interested in the fourth purpose served by the

21   invocations," namely, "the School District wanted to have invocations that publicly express

22   support for Protestant Christianity" in violation of Establishment Clause).

23

24

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

Similarly, the effect of Kennedy's prayer practice was official advancement of religion by the school. The students on the team are taught to look up to the coaches, obey them, and tailor their conduct to the coaches' wishes and preferences. Thus, not only would Bremerton students reasonably view Kennedy's prayer practice as endorsing and advancing religion, but the players on the team would, for the reasons already explained, feel pressure to conform. That would undeniably run afoul of the secular-effect requirement of the *Lemon* test.

**6.** ***Pickering* Step Five: The District had legitimate grounds to place Kennedy on paid administrative leave because he violated a clear directive from his employer.**

The arguments set forth in Section III.B.4 apply equally here. There is no proof the District put Kennedy on paid leave for anything other than violating a clear directive that he avoid what the District sincerely believed to be a risk of violating the Establishment Clause. The absence of proof means Kennedy cannot show a clear likelihood of prevailing on this element, just as it does with respect to proving his speech was a substantial factor in an adverse action by the District.

**C.** **Kennedy will not suffer irreparable harm.**

Kennedy's claim of irreparable harm rings hollow. First, he still can appear at games and pray, and second, he did not even bother to apply for a 2016 coaching job. Kennedy cannot now claim that coaching is so indispensable that a Federal Court must intervene.

**D.** **The balance of equities tips heavily in favor of the District.**

The District is not accused of retaliating against a whistleblower or covering up wrongdoing. It has simply attempted to comply with what it believes to be the law. The District gave Kennedy multiple chances to work out an accommodation. He could temporarily have

TIERNEY & BLAKNEY, PC
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1   accepted an alternative prayer location and applied for a 2016 job, while still bringing this

2   lawsuit to contest the District's position. His decision to defy his employer's directives and

3   force an immediate confrontation gives the District the stronger equitable position.

4   **E.    A preliminary injunction is not in the public interest.**

5   This question of Kennedy's prayer at the 50-yard line deserves to be resolved by a final

6   decision, very likely one that will occur soon enough via summary judgment. While everyone in

7   this country has an interest in all constitutional rights, the competing rights in this case differ in

8   their scope. The Establishment Clause creates a right that directly belongs to and affects every

9   parent and child in the Bremerton School District, while Kennedy's right to free speech belongs

10  to him alone. He is free to pray in the stands, so the alleged deprivation of his rights is limited to

11  prayer as a coach versus prayer as a spectator. If the vindication of one right or the other is to be

12  delayed until final judgment, it should be the right of the single person rather than the rights of

13  many. That is the essence of public interest.

14  ### III.   CONCLUSION

15  Kennedy's motion comes nowhere near satisfying the demanding standards for a

16  mandatory injunction. He never accomplishes the fundamental first step of establishing this

17  Court's jurisdiction to control a school district's coaching staff. He shows no clear likelihood of

18  success on proving that he spoke as a private citizen, that the District was motivated by anything

19  other than legitimate concern over its potential liability, that the context of his prayers did not

20  violate the Establishment Clause, or any of the other elements necessary for eventual success on

21  his claim under §1983. If Kennedy is to obtain injunctive relief, it should only be after success

22  at summary judgment or trial.

23

24

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1

2     DATED this 12th day of September, 2016.

3          TIERNEY & BLAKNEY, P.C.

4       By:___/s/Michael B. Tierney_____

5          Michael B. Tierney, WSBA #13662
          Paul Correa, WSBA #48312

6          Attorneys for Defendant Bremerton School
          District

7          Tierney & Blakney, P.C.
          2955 80th Ave S.E., Suite 102

8          Mercer Island, WA  98040
          Telephone: 206-232-3074

9          Facsimile:  206-232-3076
          Email: tierney@tierneylaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR
PRELIM. INJ. - 25
(3:16-cv-05694-RBL)

**TIERNEY & BLAKNEY, PC**
2955 80th Avenue SE, Suite 102
Mercer Island, WA 98040
206-232-3074

1

**CERTIFICATE OF SERVICE**

2      I certify under penalty of perjury under the laws of the State of Washington, I caused the

3 original of the foregoing document to be filed with the Clerk of the Court via electronic filing,

4 who will send notification of filing as follows:

5
Hiram Sasser                                    Rebekah Perry Ricketts
        SBA No. 24039157                                SBA No. 24074883
6 Michael Berry                                   Benjamin D. Wilson
        SBA No. 24085835                                SBA No. 24084105
7 FIRST LIBERTY INSTITUTE                         Bryan M. Clegg
2001 West Plano Parkway, Ste. 1600                      SBA No. 24097506
8 Plano, TX 75075                                 GIBSON, DUNN & CRUTCHER LLP
Tel: (972) 941-6162                             2100 McKinney Ave, Ste. 1100
9 Fax: (972) 423-6162                             Dallas, TX 75201
hsasser@firstliberty.org                        Tel: (214) 698-3100
10 mberry@firstliberty.org                         Fax: (214) 571-2900
                                                rricketts@gibsondunn.com
11                                                 bwilson@gibsondunn.com
                                                bclegg@gibsondunn.com
12

13
Anthony J. Ferate                               Jeffrey Paul Helsdon
        SBA No. 21171                                   WSBA No. 17479
14 FERATE PLLC                                     OLDFIELD & HELSDON, PLLC
4308 Echohollow Trail                           1401 Regents Blvd., Ste. 102
15 Edmond, OK 73025                                Fircrest, WA 98466
Tel: (202) 486-7211                             Tel: (253) 564-9500
16 aj@feratepllc.com                               Fax: (253) 414-3500
                                                jhelsdon@tacomalawfirm.com
17

18
      DATED this 12th day of September, 2016 at Mercer Island, Washington.
19

20                            _Alyssa Au_____
                              Alyssa P. Au
21                            Tierney & Blakney, P.C., Legal Secretary

22

23

24

DEFENDANT'S RESPONSE TO PL'S MTN. FOR          **TIERNEY & BLAKNEY, PC**
PRELIM. INJ. - 26                              2955 80th Avenue SE, Suite 102
(3:16-cv-05694-RBL)                            Mercer Island, WA 98040
                                               206-232-3074