# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

JOSEPH A. KENNEDY,             )

       Plaintiff,            )

  vs.                          ) No. 3:16-CV-05694-RBL

BREMERTON SCHOOL               )

DISTRICT,                      )

      Defendant.              )


30(b)(6) VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF

BREMERTON SCHOOL DISTRICT By AARON LEAVELL

July 11, 2019

Tacoma, Washington


REPORTED BY: Margaret Walkky, CCR, RPR, RMR, CRR

Court Reporter, License No. 2540

Job no: 25565

Page 20

1    6, that you are verifying the completeness and

2    accuracy of the District's responses to these

3    interrogatories?

4              A.   Yes.

5              Q.   I want to just draw your attention to

6    interrogatory No. 6, which goes from the bottom of

7    page 5 over to the top of page 6.  Go ahead and

8    review that and let me know when you're done.

9              A.   Okay, I'm done.

10             Q.   That interrogatory, the response to

11   that interrogatory states, "Superintendent Aaron

12   Leavell was the sole decisionmaker."

13                  Do see that?

14             A.   Yes.

15             Q.   And that was in response to an

16   interrogatory that states, "Identify all participants

17   in the decision to suspend Coach Kennedy."

18                  Do you see that?

19             A.   Yes.

20             Q.   Do you agree that you were the sole

21   decisionmaker in the decision to suspend Coach

22   Kennedy?

23             A.   Yes.

24             Q.   Go ahead and set that aside.

25                  I want to talk just a little bit about

1        A.   I would not have been involved.  Had he

2   applied for an assistant coach position, I would not

3   have been involved in that decision.

4        Q.   So you wouldn't have cared if Coach

5   Kennedy was rehired and allowed to continue praying

6   at midfield?

7        A.   No, I didn't say that.  I just said I

8   would not be involved in the process at that level of

9   hiring any assistant coach, whether it was

10  Mr. Kennedy or not.

11       Q.   I just want to make sure, your

12  testimony today is that if Mr. Kennedy reapplied to

13  Bremerton High School to be an assistant football

14  coach, you would not have stopped that process based

15  on your prior direction to Mr. Kennedy?

16       A.   That part would be correct.  I would

17  not have stopped that process.

18       Q.   If the decision had been made to rehire

19  Mr. Kennedy and that Mr. Kennedy could continue

20  performing the prayer, is it your testimony that

21  Bremerton School District would have taken no action

22  in response to that?

23       A.   We would not have allowed him to

24  continue, if he were rehired, to violate directives

25  around religious activity.

1    say I first met him through my contacts with Denise,

2    but I don't really remember.

3              Q.    About how much time have you spent with

4    Mr. Kennedy outside of the work context?

5              A.    Not much time at all.

6              Q.    Okay.  So most of your interactions

7    with Mr. Kennedy have come in the course of both of

8    your employments?

9              A.    Yeah, yeah, or his wife's employment,

10   when Joe's visiting, yeah.

11             Q.    Do you understand Mr. Kennedy to be a

12   religious man?

13             A.    Yes.

14             Q.    Have you ever questioned the sincerity

15   of his faith?

16             A.    No.

17             Q.    Are you aware Mr. Kennedy became a

18   football coach around 2008 for Bremerton High School?

19             A.    I am aware of that, yes.

20             Q.    At that time were you still principal

21   of Bremerton?

22             A.    Yes, I was.

23             Q.    And you left Bremerton High School in

24   2009; is that right?

25             A.    Yes.

1    do you -- at the football games that you did attend,

2    do you ever remember noticing Coach Kennedy engaging

3    in any prayer-related activity?

4           A.   No, I did not.

5           Q.   To your knowledge, Joe Kennedy was a

6    good example to the young men that were participating

7    in Bremerton High School football?

8           A.   Absolutely.

9           Q.   He was a good mentor for them?

10          A.   Yes.

11          Q.   Do you think he had a positive

12    influence on the lives of those young men?

13          A.   I sure do.

14          Q.   Do you ever receive -- let's break this

15    up before September 2015 and after.

16          So focusing on before 2015, did you

17    ever receive any complaints from players specifically

18    about Coach Kennedy?

19          A.   No.

20          Q.   Did you ever receive any complaints

21    from parents about Coach Kennedy?

22          A.   No.

23          Q.   And did you ever receive any complaints

24    from coaches about Coach Kennedy?

25          A.   No.

Page 59

1          Q.   Did you ever receive any complaints

2     from any of the other members of the Bremerton High

3     School administration about Coach Kennedy?

4          A.   No.

5               (Exhibit-7 marked.)

6          Q.   Dr. Leavell, the court reporter has

7     handed you Exhibit-7 and Exhibit-7 is a set of

8     documents that we received from the District in a

9     public records request.

10         A.   Okay.

11         Q.   That consists of a series of coaching

12    evaluations for Coach Kennedy that span 2008 to, I

13    believe 2012 is the latest one that was included in

14    this packet.  Do you see those?

15         A.   Yes, sir.

16         Q.   Do you remember reviewing these

17    coaching evaluations at all in the course of your

18    investigation, these prior coaching evaluations?

19         A.   Yes.  I was trying to think if I

20    reviewed them all, but yes, I reviewed them.

21         Q.   You generally remember looking at his

22    file --

23         A.   Yes.

24         Q.   -- and his prior evaluations?

25         A.   Yes.

Page 60

1          Q.   And do you ever remember seeing any
2     concerns raised in these evaluations about Coach
3     Kennedy's performance?
4          A.   Can I take a moment to look through
5     them?
6          Q.   Feel free.
7          A.   Okay.
8               Okay.
9          Q.   My question was, do you ever remember
10    seeing any concerns raised in Coach Kennedy's
11    personnel file about his performance?
12         A.   So I've not looked through his entire
13    personnel file, but the documents here before me, no,
14    no concerns ever came to me.
15         Q.   And thinking back to your investigation
16    in 2015 when you reviewed various documents including
17    these on Coach Kennedy, do you remember ever seeing a
18    document that raised concerns about his performance
19    as a coach?
20         A.   No, nothing was brought to my
21    attention.
22         Q.   In the documents, the performance
23    evaluations that we've handed to you and marked as
24    Exhibit-7, there was always the recommendation to
25    rehire Coach Kennedy?

1          A.   In my mind, yes, I assumed we were

2     moving forward, moving on, if you will, from that

3     immediate issue, yes.

4          Q.   There was a varsity football game the

5     next day, September 18, which was a Friday.  Is that

6     your recollection?

7          A.   Yes.

8          Q.   Were you at that game?

9          A.   I believe I was at that game.

10         Q.   Did you attend specifically because of

11    wanting to see what would happen with the post-game

12    activities?

13         A.   I attended, A, because I attend

14    football games and like to support the team, and B, I

15    wanted to make sure that we had as many

16    administrative staff there as possible because there

17    was still a large uprising of social media people

18    saying they were coming to support Coach Kennedy, and

19    so I attended primarily for safety reasons.

20         Q.   What do you remember about that

21    September 18 game?

22         A.   I don't remember much about that game.

23    I don't remember much about it.

24         Q.   Do you remember there being any crowd

25    control issues?

Page 99

```
 1   clear in my mind there was not the game that I was
 2   thinking of.
 3             Q.   It was the game that you were just
 4   describing a few minutes ago was -- you may have had
 5   them mixed up?
 6             A.   Yes.
 7             Q.   You would rely on what you said in this
 8   email the next morning as a more accurate
 9   representation of what had happened?
10             A.   I would, yes.  Thank you.
11             Q.   So based on this email, it did not
12   appear that there was any real problems that you saw
13   with the way the post-game activities were conducted?
14             A.   Correct.
15             Q.   You noted that, this is the third
16   sentence, "The post-game gathering was conducted
17   well, and did not last that long."
18             Is that what you wrote in this email?
19             A.   I did, yes.
20             Q.   No reason to dispute that now?
21             A.   No.
22             Q.   Do you recall between now, --
23             A.   I got you.
24             Q.   -- I think it's between September 18
25   and the middle of October whether you attended any
```

1    other Bremerton High School football games?

2            A.   I don't recollect if I did or not.  I

3    did not attend all of them.  I do remember that.

4            Q.   You don't remember one way or the

5    other, though, whether you went to any particular

6    games in the time period from here until the prayer

7    issue resurfaced?

8            A.   No, I don't remember.  If I did, I may

9    have stayed for a half and, you know, went home.  I

10   don't remember at this point.

11           Q.   Let me ask this a different way.

12                Do you remember ever going to a game

13   between the September 18th game and when the prayer

14   issue resurfaced again with the purpose of observing

15   Mr. Kennedy's actions?

16           A.   Yes.  When he resumed his actions, I

17   did attend at least one game.

18           Q.   My question was before that happened.

19           A.   Yeah, I don't think I did, but --

20           Q.   Did you ever assign anybody from the

21   District to go and observe and listen to what

22   Coach Kennedy was saying at this, the post-game?

23           A.   Yeah, so I don't assign people to go to

24   games, but the high school administration and

25   athletic director and there are some staff that are

Page 101

1    paid to supervise games, attend them.  And I believe

2    I had asked either John Polm or one of the assistant

3    principals to see if there was anything being stated

4    other than a motivational speech.

5              Q.   So as of Saturday, September 19, 2015,

6    did you personally think that you had moved past this

7    issue?

8              A.   I was hoping that we had moved past

9    this issue, certainly.

10             MR. ANDERSON:  Let's go ahead and go

11   off the record.

12             THE VIDEOGRAPHER:  We're going off the

13   record at 11:46 a.m.

14             (Lunch recess 11:46 a.m. to 12:37 p.m.)

15             THE VIDEOGRAPHER:  We're back on the

16   record.  This is the beginning of disk number 3.  The

17   time is 12:37 p.m.

18   BY MR. ANDERSON:

19             Q.   Dr. Leavell, I want to come back to

20   Exhibit-17, which I think was the last one we were

21   looking at, your email to the board members of

22   September 19, 2015.  Do you have that back in front

23   of you?

24             A.   I do.

25             Q.   This was your report from the

1            My question for you is, if you look at

2   page 5, which follows the discussion of the case law,

3   if you want to just look at the top paragraph on that

4   page, I'll have a question for you about this.

5            The first sentence in that paragraph

6   says, "No reasonable observer could conclude that a

7   football coach who waits until the game is over and

8   the players have left the field and then walks to

9   midfield to say a short, private, personal prayer is

10  speaking on behalf of the state."

11           Do you see that?

12      A.   I see that.

13      Q.   And that's consistent with your

14  understanding or this sentence is consistent with

15  your understanding that Coach Kennedy was now asking

16  to engage in a short, private, personal prayer at

17  midfield after the game?

18      A.   Yes.  I'm just --  I'm not sure if he

19  meant while there was still folks in the stadium, or

20  after everyone had left and he returned to the

21  stadium, but...

22      Q.   What it states here is after the game.

23  It does not specify whether it was immediately or

24  sometime later; is that what you're saying?

25      A.   Yeah, that's what I was asking.

1    that way.  All coaches have the supervision duties

2    after the game is over, and so he was still on duty

3    and had supervision tasks to deal with as expected of

4    all assistant coaches.

5              Q.   So your point there was not that a

6    brief, private, personal prayer itself was some

7    abdication of supervision responsibilities, but that

8    he had responsibilities generally so he was still

9    acting as a coach when he was engaged in that

10   activity?

11             A.   Yes.

12             Q.   The District certainly wouldn't

13   discipline anybody for engaging in a 15 to 30-second

14   phone call immediately after a football game, right?

15             A.   I don't know.  I would suppose there

16   are different scenarios where that would not be

17   appropriate to make a phone call immediately

18   following a football game.

19             Q.   So I want to be -- I want the record to

20   be clear here.  Is it your position if the District,

21   if it saw an assistant football coach looking at his

22   phone for 10 seconds immediately following a football

23   game, the District would engage in a disciplinary

24   action?

25             A.   I would say --

1          Q.    That's a yes or no question, sir.

2          A.    No.

3          Q.    If, for example, an assistant coach

4    went to go greet a spouse in the stands immediately

5    following a game for 30 seconds to a minute, the

6    District would not take disciplinary action against

7    that assistant coach, correct?

8          A.    Correct.

9          Q.    So I want to move now to the third

10   page.  We were just on the second page.  If we go to

11   the third page, the second paragraph that begins,

12   "Moreover," let me know if you have that in front of

13   you.

14         A.    Okay.

15         Q.    The second sentence of that paragraph,

16   Dr. Leavell, states, "He is free to engage in

17   religious activity, including prayer, even while on

18   duty, so long as doing so does not interfere with

19   performance of his job duties, and does not

20   constitute District endorsement of religion."

21              Did I read that correctly?

22         A.    Yes.

23         Q.    Here the District's concern was that

24   Mr. Kennedy's prayer would constitute District

25   endorsement of religion; is that right?

Page 134

1    know who else I would have asked.

2              Q.    You recall yourself being in

3    attendance?

4              A.    I'm pretty sure that I was at that

5    game.

6              Q.    You can't be certain?

7              A.    Well, I can't be certain.  I was just

8    thinking back to when I had the games confused in my

9    head before.  I mean, it was four years ago, I'm

10   sorry.  I believe I was in attendance at this game.

11             Q.    Okay.

12             A.    Yes, I believe I was there.

13             Q.    Do you recall Coach Kennedy engaging in

14   prayer at the 50-yard line at the conclusion of the

15   Centralia game?

16             A.    Yes, I believe so.

17             Q.    Do you recall about how long that

18   prayer lasted?

19             A.    No, I don't recall, but I believe it

20   was less than a minute.

21             Q.    Yeah.

22             A.    About a minute.

23             Q.    Other than Coach Kennedy, do you

24   remember whether anybody else was on the field with

25   him?

1           Q.   It states, "When a school official

2      decides to lead a prayer, he or she puts students in

3      an awkward position."

4                Do you see that?

5           A.   I do.

6           Q.   Do you agree with that?

7           A.   Yes.

8           Q.   Now, if you look at your email response

9      to Mr. Dorn at the top of Exhibit-29, can you read

10     the third sentence out loud, the one that begins "The

11     issue"?

12          A.   "The issue is quickly changing as it

13     has shifted from leading prayer with student

14     athletes, to a coach's right to conduct a personal,

15     private prayer on the 50-yard line."

16          Q.   You just testified that you don't

17     have -- that you agree with the statement that you

18     don't have a problem with students or staff

19     exercising their right to silently pray on their own,

20     right?

21          A.   Correct.

22          Q.   Your problem with Coach Kennedy's

23     prayer was the timing of the prayer, specifically

24     that it was right after the game, and then the

25     location of the prayer, that it was at the 50-yard

Page 149

1          A.    Correct.

2          Q.    Why was this decision made to have this

3    letter issued from you as opposed to Mr. Ganson?

4          A.    Because I am the superintendent who was

5    being the decisionmaker in this case, and because it

6    involved a topic that is not my area of expertise, I

7    relied pretty heavily on legal advice on how to

8    handle this from the school district perspective.

9          Q.    When you say topic not within your area

10   of expertise, you mean First Amendment constitutional

11   law?

12         A.    Yes.

13         Q.    Holdings of cases about what school

14   officials can or can't do.

15         A.    Yes.

16         Q.    Is that correct?  Okay.

17               So I want to walk through this letter

18   beginning with the first paragraph.  Can you just

19   read that paragraph out loud?

20         A.    "On September 17, 2015, I provided you

21   with guidance and a set of standards for compliance

22   with Bremerton School District Board Policy 2340.

23   Those directives were in response to your prior

24   practices involving on-the-job prayer with players in

25   the Bremerton High School football program, both in

1    the locker room prior to games, as well as on the

2    field immediately following games.  In general, I

3    believe that you have attempted to comply with the

4    guidelines set forth in that letter."

5              Q.   What did you mean by that last

6    sentence, "In general, I believe that you have

7    attempted to comply with the guidelines set forth in

8    that letter"?

9              A.   I believe that Mr. Kennedy was at times

10   attempting to abide by the directives of the District

11   in the sense that he was not leading student-led

12   prayer as he previously was, technically in the

13   locker room and immediately following the games.

14             Q.   The difference here was that he was

15   attempting to do a personal prayer, as opposed to

16   having a coach-led student prayer?

17             A.   I mean, that's what it appeared his

18   intentions were, yes.

19             Q.   That was what you were referencing here

20   when you say you believe he attempted to comply with

21   the guidelines?

22             A.   Yes.

23             Q.   Then you go on to state in the next

24   paragraph, recap what had happened at that Centralia

25   game that we were discussing; is that right?

1              Q.    Did you ask any of your administration

2     staff to be at that game, at either of those two

3     games?

4              A.    Yes.

5              Q.    Who did you ask to be there?

6              A.    They would have been there anyway to

7     supervise, but I believe I asked -- it was either the

8     principal, John Polm, or I think it was the assistant

9     principal, Ryan Nickels.

10             Q.    I want to talk about the first video,

11    which was video from the -- after the varsity game

12    against North Mason.

13             A.    Okay.

14             Q.    This was the one that was a little

15    grainer that we had to watch twice.  Did you recall

16    seeing Coach Kennedy on a knee near the middle of the

17    field at a one point in that video?

18             A.    Yes.

19             Q.    Would you agree that the time he was on

20    a knee was about 15 seconds or less?

21             A.    Yes.

22             Q.    Did you see any other students praying

23    with him at that time?

24             A.    Not at that time.

25             Q.    My question is specifically about the

Page 165

1  October 23rd game.  So your testimony is you didn't

2  observe any students praying with him?

3          A.   It's hard to make it out, but not that

4  I could see.

5          Q.   Based on the video?

6          A.   Based on that video, no.

7          Q.   At that point in time, the Bremerton

8  High School students were moving out of the handshake

9  with the opposing team going to go sing the fight

10  song; is that what it looked like?

11          A.   Well, it looked like they were moving

12  out of there -- I don't know if that is something

13  they do on away games.  I don't know if they go to

14  sing the fight song or not.  So I can't verify that.

15          Q.   Was that an away game, the North Mason

16  game?

17          A.   It looks like it, but I don't know.

18          Q.   When you say it looked like it, what

19  was it, the color of uniforms?

20          A.   It didn't look like our home uniforms

21  and it really didn't look like our field, so I think

22  that was an away game.

23          Q.   You don't know one way or the other

24  whether the fight song is a tradition that is

25  followed at away games?

1          A.   I don't, actually.  I assumed it was.

2    I think it's a home game tradition, but I could be

3    mistaken.

4          Q.   And in that video, did you see other

5    football coaches milling about in that immediate

6    aftermath of the game?

7          A.   It appeared that I saw one coach

8    talking with another, with a North Mason coach.

9          Q.   You would agree that the 10 to 30

10   seconds, however long it was that coach was on a knee

11   based on that video, it did not appear coach was

12   ignoring supervision of any of the players?

13         A.   Well, for that time that he was doing

14   that, if he was kneeling with his eyes closed, it

15   would be hard to do supervision.

16         Q.   But no different than if a coach was

17   briefly checking his phone for a sports score?

18         A.   I don't know.  I mean, if the coach is

19   checking a sports score, he might be able to have

20   more of a line of sight, his eyes open.

21         Q.   What about if the coach had to kneel

22   down and tie his shoe, look at his shoe, would you

23   think the coach was ignoring his supervisory

24   responsibilities to kneel down to tie his shoe for 20

25   seconds?

1          A.    No.

2          Q.    The second video was the junior varsity

3    game.  That was again the video that had a little bit

4    of a higher resolution.

5          A.    Uh-huh.

6          Q.    Similar question, it appeared to be

7    that coach kneeled down for about 10 to 20 seconds,

8    approximately, for that prayer?

9          A.    It appeared to be.

10         Q.    And you saw the student athletes return

11   to coach only after he had completed the prayer?

12         A.    Yes, it sounded like after they had

13   sang the fight song.

14         Q.    Do you know whether the North Mason JV

15   game was home or away?

16         A.    That appeared to be at home.

17         Q.    And you base that off of the appearance

18   of the field?

19         A.    Again, I think same scenario, it looked

20   like the home uniforms and it looked like our field.

21         Q.    Are the purple uniforms traditionally

22   the home uniforms?

23         A.    They're blue.

24         Q.    Blue, excuse me.

25         A.    Blue and gold, yes.

Page 168

```
1              Q.    The blue and gold?

2              A.    (Nods head.)

3              Q.    Okay, and again, the student athletes

4    returned to Coach Kennedy only after he prayed and

5    they sung the fight song, right?

6              A.    That's what it looks like.

7              Q.    So they were still under his

8    supervision at that point in time?

9              A.    As they came back to him, yes.

10             Q.    Yes.

11                   And it was based on Coach Kennedy

12   continuing to engage in prayer at these two North

13   Mason games, first the varsity one and then the

14   junior varsity one, after receiving this additional

15   letter from you on October 2rd, that was the basis

16   for your decision to place him on administrative

17   leave?

18             A.    My basis for putting Coach Kennedy on

19   leave was that he continued to disobey directives

20   from me.  He was invited to come meet with me to

21   further discuss any accommodations or solutions, and

22   he did not engage on that level.

23                   He continued to do exactly what his

24   position and his position of his attorneys outlined

25   for him to do in the letter that was sent to me and
```

1    made it very clear in that letter that the only

2    accommodation that would be suitable for Coach

3    Kennedy was to continue the exact practice that he

4    was already engaged in.

5              Q.    That practice was the practice that we

6    saw on those two video clips that we just watched

7    from those North Mason games?

8              A.    Yes.

9              Q.    If coach had stopped engaging in the

10   type of prayer that we just saw on those videos for

11   those North Mason games, you would not have acted to

12   place him on leave; is that right?

13             A.    If Coach Kennedy had reengaged with us

14   as invited and we were able to come to an agreement

15   on an accommodation that meets his religious needs

16   and didn't jeopardize the District with litigation,

17   then there would be no -- there would be no reason to

18   continue to place him on leave, but --

19             Q.    When you say -- sorry.

20             A.    I was going to say, but he continued to

21   conduct himself in the manner in which he said he was

22   going to, and so I continued to write letters of

23   direction that are nondisciplinary in hopes that we

24   could come to a resolution so that Coach Kennedy

25   could continue coaching our students.

1          Q.   When you said jeopardized the District

2     with litigation, you're referring to potential

3     litigation that could be brought against the District

4     for the District violating the First Amendment by

5     allowing Coach Kennedy to engage in the prayer; is

6     that right?

7          A.   Correct, yes, correct.

8          Q.   And just so we're clear for the record,

9     when you said, when you referred to Coach Kennedy

10    conducting himself in that manner, you're referring

11    to the manner, you're referring to the prayer like we

12    just saw in the two videos?

13         A.   I'm referring to him participating in

14    overt displays of religious activity.

15         Q.   Such as kneeling and bowing one's head

16    on the middle of the football field after a game?

17         A.   Yes, because he had told the world that

18    that is what he was doing.  So yes.

19         Q.   And then the District's view was, given

20    that context, him kneeling on the field would only

21    have been perceived as him actually engaging in

22    prayer, and the District allowing him to do that

23    would be the District effectively saying this is

24    okay, this is a permissible activity for a coach

25    after a game?

1          A.   Yes.

2          Q.   Is it your testimony today that

3    consistent with the representations made here to the

4    government, that the District's course of action in

5    this matter has been driven solely by concern that

6    Mr. Kennedy's conduct might violate the

7    constitutional rights of students and other community

8    members, thereby subjecting the District to

9    significant potential liability?

10         A.   Yes.

11         Q.   And that would be a true, accurate and

12   complete description of the reason for the District's

13   actions?

14         A.   Yes, it's accurate.

15              MR. ANDERSON:   I don't have any further

16   questions at this time.

17              MR. TIERNEY:   I have three or four

18   questions.

19

20              E X A M I N A T I O N

21   BY MR. TIERNEY:

22         Q.   Could you find Exhibit-20 for me,

23   please.

24         A.   Okay.

25         Q.   Could you turn to page 5 of that.

1                     S I G N A T U R E

2

3

4

5    I declare under penalty of perjury under the laws of

6    the State of Washington that I have read my within

7    deposition, and the same is true and accurate, save

8    and except for changes and/or corrections, if any, as

9    indicated by me on the CHANGE SHEET flyleaf page

10   hereof.  Signed in...............WA on the......day

11   of................., 2019.

12

13

14

15                      .........................

16                      AARON LEAVELL 30(b)(6)

17                      Taken: July 11, 2019

18

19

20

21

22

23

24

25

Page 202

```
 1                    C E R T I F I C A T E

 2

 3     STATE OF WASHINGTON     )ss.

 4     COUNTY OF KING          )

 5

 6

 7     I, Margaret Walkky, the undersigned Registered Merit
       Reporter and an officer of the Court for the State of
 8     Washington, hereby certify that the foregoing
       30(b)(6) deposition upon oral examination of AARON
 9     LEAVELL was taken before me on July 11, 2019 and
       transcribed under my direction;

10
       That the witness was duly sworn by me pursuant to RCW
11     5.28.010 to testify truthfully; that the transcript
       of the deposition is a full, true, and correct
12     transcript to the best of my ability; that I am
       neither attorney for, nor a relative or employee of,
13     any of the parties to the action or any attorney or
       counsel employed by the parties hereto, nor
14     financially interested in its outcome;

15     I further certify that in accordance with CR 30(e),
       the witness was given the opportunity to examine,
16     read, and sign the deposition, within 30 days, upon
       its completion and submission, unless waiver of
17     signature was indicated in the record.

18     IN WITNESS WHEREOF, I have hereunto set my hand and
       seal this date: July 22, 2019.

19

20

21

22             ............................
               Margaret Walkky, Registered Merit Reporter
23             Certified Court Reporter No. 2540 License
               expires July 18, 2020

24

25
```