UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOSEPH A. KENNEDY, | CASE NO. 3:16-cv-05694-RBL |
| Plaintiff, | |
| v. | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| BREMERTON SCHOOL DISTRICT, | DKT. ## 63, 70 |
| Defendant. | |

## INTRODUCTION

THIS MATTER is before the Court on the parties' Cross-Motions for Summary Judgment. Dkt. ## 63, 70. Plaintiff Joseph Kennedy, a former football coach at Bremerton High School, was suspended in 2015 after he refused to change his practice of praying at the 50-yard line immediately after games. The ensuing dispute has highlighted a tension in the First Amendment between a public-school educator's right to free religious expression and their school's right to restrict that expression when it violates the Establishment Clause. Although the Court is sympathetic to Kennedy's desire to follow his beliefs, the former right must give way to the latter in this case. The Court therefore GRANTS Defendant Bremerton School District's Motion for Summary Judgment and DENIES Kennedy's Motion.

# BACKGROUND

## 1. *Kennedy's Coaching Career and History of Religious Conduct with Players*

Kennedy was employed as a football coach at Bremerton High School (BHS) from 2008 until the 2015-16 season. Kennedy Dec., Dkt. # 71-4, at 1. As an assistant coach, Kennedy had to help the head coach with team supervision, assume direct supervisorial authority when designated by the head coach, and "[o]bey all Rules of Conduct before players and the public." Dkt. # 64-4 at 15. In addition to these practical responsibilities, Kennedy's position required him to act as a "mentor and role model for the student athletes, . . . exhibit sportsmanlike conduct at all times, . . . maintain positive media relations, . . . [and strive to] create good athletes and good human beings." Coaching Agreement, Dkt. # 64-2 at 11. In Kennedy's own estimation, a coach's role extends far beyond merely teaching a sport and often involves a large amount of influence over student athletes. Kennedy Dep., Dkt. # 64-24, at 106-108.

According to his colleagues and superiors, Kennedy was a successful and dedicated coach when he worked at BHS. Polm Dep., Dkt. # 71-5, at 42-43; Saulsberry Dep., Dkt. # 71-6, at 14; Boynton Dep., Dkt. # 71-7, at 12. Kennedy also was (and is) a practicing Christian, and his sincerely-held beliefs required him to "give thanks through prayer, at the end of each game, for what the players had accomplished and for the opportunity to be a part of their lives through the game of football." Kennedy Dec., Dkt. # 71-4, at 2-3. This took the form of a roughly 30-second prayer that Kennedy delivered on one knee at the 50-yard line immediately after the players and coaches shook hands after the game. *Id*. at 3. According to Kennedy, these prayers were private communications with God that Kennedy committed to after watching a 2006 film called *Facing the Giants*. *Id*. at 2-3.

Kennedy recounts that when he began this practice in 2008 he would pray alone. *Id*. at 3. However, when players from the BHS team began to join him, he did not interfere. *Id*. Although the number of participating players varied from game to game, Kennedy recalls that a majority of the team eventually took part. *Id*. Eventually, Kennedy began delivering inspirational speeches with religious references after games. *Id*. at 4. He would also participate in pre- and post-game locker room prayers, although he testifies that these were not required by his religious beliefs. *Id*. Kennedy emphasizes that he "never coerced, required, or asked any student to pray with [him] at the conclusion of games." *Id*.

### 2. The District issues a Directive to Kennedy Limiting his Religious Conduct around Players on September 17, 2015

Although Kennedy's religious activity with student athletes went on for years, the District did not find out about it until September 2015 when a coach from an opposing team informed BHS Principal Polm that Kennedy had asked his team to join him in prayer on the field. Polm Dep., Dkt. # 71-5, at 55-56. Kennedy was first approached about his praying on September 11, when Athletic Director Barton spoke with Kennedy after a game and expressed disapproval when Kennedy conducted a prayer on the field. Kennedy Dep., Dkt. # 71-10, at 24-25. This prompted Kennedy to post on Facebook that he might get fired for praying. *Id*. at 25.

After an inquiry, the District sent Kennedy a letter on September 17, 2015, stating that his practices of giving religious inspirational talks at the 50-yard line (which "evolve[ed] organically" from his prayer at the 50-yard line) and leading prayer in the locker room likely violated District policy. September 17 Letter, Dkt. # 64-8, at 1. Specifically, the letter explained that the conduct likely ran afoul of Board Policy 2340, which seeks to avoid violations of the Establishment Clause by requiring that school staff neither encourage nor discourage students

from engaging in religious activity. *Id.* at 1-2. Although noting that it "may not address every potential scenario," the letter closed with the following directive:

> Student religious activity must be entirely and genuinely student-initiated, and may not be suggested, encouraged (or discouraged), or supervised by any District staff. . . . You and all District staff are free to engage in religious activity, including prayer, so long as it does not interfere with job responsibilities. Such activity must be physically separate from any student activity, and students may not be allowed to join such activity. In order to avoid the perception of endorsement discussed above, such activity should either be non-demonstrative (i.e., not outwardly discernable as religious activity) if students are also engaged in religious conduct, or it should occur while students are not engaging in such conduct.

*Id.* at 3. Some students and parents expressed thanks for the District's directive that Kennedy cease praying after games, with some noting that their children had participated in the prayers to avoid being separated from the rest of the team or ensure playing time. Barton Dec., Dkt. # 65, at 2; Leavell Dec. at 7; Polm Dep., Dkt. # 64-25, at 73-74; *see also* Saulsberry Dep., Dkt. # 64-26, at 19-20.

After meeting with Kennedy to further explain the situation, Superintendent Leavell testified that Kennedy was "not happy" with the District's directive but agreed to abide by it. Leavell Dec., Dkt. # 67, at 4. At the September 18 game, Kennedy ceased praying in the locker room, omitted religious references in his inspirational speech, and prayed on the field only after the stadium had emptied. Kennedy Dec., Dkt. # 71-4, at 5. For the following five varsity and junior varsity games, Kennedy testified at his deposition that he either does not remember the manner in which he prayed or recalls that he prayed for 10-15 seconds while the team was performing the fight song, walking off the field, or heading to the bus. Kennedy Dep., Dkt. # 71-10, at 163-65. It is unclear whether he prayed at the 50-yard line. *Id.* Although Kennedy states that there were school administrators at these games, Leavell, Polm, and Barton were unaware of Kennedy's prayer at the time and believed he had ceased praying immediately

after games. Leavell Dec., Dkt. # 82, at 2; Polm Dec., Dkt. # 80, at 2; Barton Dec., Dkt. # 81, at 2. After Kennedy changed his practices in September, no students were witnessed praying on the field independently. Leavell Dec., Dkt. # 67, at 7.

### 3.    *Kennedy Opposes the District's Directive, makes Media Appearances, and Prays at the October 16 Homecoming Game*

On October 14, the District received a letter from Kennedy's lawyers requesting a religious accommodation on his behalf. October 14 Letter, Dkt. # 71-16. The letter emphasized that Kennedy's prayers were not obviously Christian and occurred "after his official duties as a coach have ceased." *Id.* at 2. In light of this, Kennedy's lawyers insisted that his prayers were private speech and that the District could not prohibit him from praying with students if they voluntarily joined. *Id.* at 6-7. The letter thus advised the District that Kennedy would resume praying at the 50-yard line after the October 16 homecoming game and requested that the District rescind its September 17 directive with respect to this practice. *Id.* at 6.

Meanwhile, Kennedy began making media appearances spreading the word that he intended to pray after the October 16 game. Kennedy Dep., Dkt. # 64-24, at 72-73. The Seattle Times published an article on October 14 announcing Kennedy's plans for the upcoming game, and a local news story aired before the game that explained the conflict with the District and included a statement from Kennedy that he planned to "do what [he'd] always done" at the game. Seattle Times Article, Dkt. # 64-11; Local News Video, Dkt. 64-12. The District also began receiving a large amount of emails, letters, and phone calls regarding the conflict over Kennedy's prayer, many of which were hateful or threatening. Leavell Dec., Dkt. # 67, at 3. This may have been originally triggered by Kennedy's September 11 Facebook about getting fired for praying.

Given this public response, Superintendent Aaron Leavell anticipated that members of the community would likely try to join Kennedy on the field after the homecoming game and that the District was currently unprepared to prevent this. September 18 Email, Dkt. # 64-9; Leavell Dec., Dkt. # 67, at 4. This prediction proved accurate, as a large number of people came onto the field after October 16 game. Leavell Dec. at 6. In the rush to reach the field, some band members and cheerleaders were knocked down. *Id*. Kennedy himself followed his custom of praying at the 50-yard line after the players had shaken hands, except this time he was surrounded by cameras and joined by a group of players, coaches, and even a state representative (the BHS players were busy singing the school's fight song at the time). Kennedy Dep., Dkt. # 64-24, at 69-70; Photo of October 16 Game, Dkt. # 64-13.

**4.    *The District Reiterates its Concerns and Kennedy Continues to Pray at the 50-Yard Line after Games***

After October 16, the District increased security at games and placed robocalls to parents informing them that there was no public access to the field. Leavell Dec., Dkt. # 67, at 6. The District also sent another letter to Kennedy on October 23 informing him that his conduct at the homecoming game did not comply with the September 17 directive. October 23 Letter, Dkt. # 64-14, at 1. The letter emphasized that Kennedy's duties as an assistant coach did not cease immediately after games and continued until the players were out of the dressing rooms and released to their parents. *Id*. at 2. Indeed, the head coach of the BHS team had confirmed that Kennedy was among those assistant coaches "with specific responsibility for the supervision of players in the locker room following games." *Id*.; *see also* Polm Dep., Dkt. # 64-25, at 47; Kennedy Dep., Dkt. # 64-24, at 41-42 (testifying that he is performing "football coaching functions . . . until the last kid leaves [the stadium]"). The letter also stated that the "[d]evelopment of accommodations is an interactive process" and suggested the possibility of

finding other options for Kennedy's prayer, such as a private location at the field. October 23

Letter at 2-3; *see also* Polm Dep., Dkt. # 64-25, at 46-49 (explaining that Kennedy was told he

could pray on the field when his supervisory duties had ceased). However, Kennedy's current

practices "drew him away from [his] work" and, to a reasonable observer, appeared as District

endorsement of religion. October 23 Letter at 2.

Kennedy did not take the District up on its offer to keep discussing religious

accommodations. Leavell Dec., Dkt. # 67, at 5. Instead, Kennedy continued his practice of

praying at the 50-yard line in the next two games. At the October 23 game, Kennedy prayed

alone in the middle of the field while the players headed to the stands. Video of October 23

Game, Dkt. # 71-20. At the October 26 game, Kennedy initially knelt down by himself but was

then joined by about a dozen other adults. Video of October 26 Game, Dkt. # 71-22. Once the

players finished their fight song, they joined Kennedy at the middle of the field after he had

finished his kneeling prayer. *Id*.

**5.** ***The District Places Kennedy on Administrative Leave and he Declines to Reapply for his Position as an Assistant Coach***

Citing Kennedy's decision to keep praying on the field at the games on October 16, 23,

and 26, the District placed Kennedy on paid administrative leave on October 28, 2015 for

violating the District's prior directives. October 28 Letter, Dkt. # 64-16. Although the October 23

letter had mentioned that Kennedy's prayer distracted him from his supervisorial duties, the risk

of constitutional liability associated with Kennedy's religious conduct was the "sole reason" the

District ultimately suspended him. Leavell Dep., Dkt. # 71-9, at 197; *see also* District Statement

and Q&A regarding Kennedy, Dkt. # 71-2, at 1 (placing Kennedy on leave was "necessitated" by

his refusal to cease his "overt, public religious displays."). Kennedy was no longer allowed to

participate in games as a coach but could attend them as a member of the public, which he did on

October 30 when he prayed in the bleachers with a group of people. *Id.*; Photo of Kennedy Praying in Bleachers, Dkt. # 64-17; Leavell Dec., Dkt. # 67, at 7. Although the October 28 letter renewed the District's invitation to discuss alternative accommodations, Kennedy did not respond. October 28 Letter; Kennedy Dep., Dkt. # 64-24, at 100.

Kennedy's evaluations for the 2015 season by Head Coach Gillam and Athletic Director Barton reflected the drama that had played out with the District. Gillam gave Kennedy low marks for putting his own interests over those of the team, although Kennedy received high marks for his relationship with players and other qualities. Gillam Evaluation, Dkt. # 64-19. Barton similarly praised Kennedy's coaching skills but criticized his lack of cooperation, noting that he "never came in after numerous requests and contacts." Barton Evaluation, Dkt. # 64-20. At the end of the 2015 season, Gillam resigned as head coach after eleven years in the position, and the six assistant coach contracts also expired. Gillam Dec., Dkt. # 66, at 3; Steedman Dec., Dkt. # 22, at 3. Kennedy was one of four current assistant coaches who did not reapply for their jobs. Steedman Dec. at 3.

**6.** *Procedural History*

Kennedy filed suit in this Court on August 9, 2016. Complaint, Dkt. # 1. Kennedy's first two claims under 42 U.S.C. § 1983 allege the District violated his First Amendment rights to free speech and free exercise by limiting his practice of praying at the 50-yard line and ultimately placing him on leave. *Id.* at 13-14. Kennedy's remaining five claims fall under Title VII of the Civil Rights Act of 1964 and allege failure to re-hire, protected characteristic as a motivating factor, disparate treatment, failure to accommodate, and retaliation. *Id.* at 14-16. Kennedy asks for declaratory relief and an injunction reinstating him as a BHS assistant coach with an acceptable religious accommodation for his practice of praying at the 50-yard line. *Id.* at 16.

Kennedy moved for a preliminary injunction based on his First Amendment claims on August 24, 2016. Dkt. # 15. The Court denied that motion at a hearing held on September 19. Dkt. # 25. Kennedy appealed, and the Ninth Circuit affirmed on the basis that Kennedy's prayers were delivered in his capacity as a public employee and were thus unprotected speech. *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813 (9th Cir. 2017) (*Kennedy I*). The Supreme Court denied certiorari, but four of the justices issued a concurring opinion expressing skepticism at the prior holdings. *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634 (2019) (*Kennedy II*). Now, both parties have moved for summary judgment on all seven of Kennedy's claims.

## DISCUSSION

### 1. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. *Anderson*, 477 U.S. at 248.

On cross-motions, the defendant bears the burden of showing that there is no evidence which supports an element essential of the plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Conversely, the plaintiff "must prove each essential element by undisputed facts." *McNertney v. Marshall*, No. C-91-2605-DLJ, 1994 WL 118276, at *2 (N.D. Cal. Mar. 4, 1994) (citing *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir.1986)). Either party may

defeat summary judgment by showing there is a genuine issue of material fact for trial. *Id.*; *Anderson*, 477 U.S. at 250. Although the parties may assert that there are no contested factual issues, this is ultimately the court's responsibility to determine. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## 2.    Section 1983 Free Speech Claim

To succeed in his claims under § 1983, Kennedy must prove that the District acted under color of state law to violate his constitutional rights under the First Amendment. *Stein v. Ryan*, 662 F.3d 1114, 1118 (9th Cir. 2011). In cases involving the free speech rights of government workers, First Amendment protections aim "both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006). This balancing test between employer control and individual freedom traces back to *Pickering v. Board of Ed. of Township High School Dist. 205*, 391 U.S. 563 (1968), but has evolved through subsequent cases. *See Ceballos*, 547 U.S. at 417-20 (collecting cases).

Today, the Ninth Circuit has boiled this precedent down to a First Amendment retaliation test that requires asking five sequential questions: "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Eng v. Cooley*, 552 F.3d 1062,

1070 (9th Cir. 2009).[1] A plaintiff's failure to satisfy a single one of these requirements is fatal to their claim. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 961 (9th Cir. 2011).

### a. Whether Kennedy Spoke as a Private Citizen or Public Employee

The District first contends that Kennedy's prayer at the 50-yard line was delivered in his capacity as a public employee, while Kennedy argues that it was private speech falling outside of his coaching role. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Ceballos*, 547 U.S. 410, 421. In *Ceballos*, the speech at issue—a critical disposition memo—indisputably fell within Ceballos's responsibilities as a prosecutor, giving the Court "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties." *Id.* at 424. Nonetheless, the Court pointed out that the "proper inquiry is a practical one" and that "employers can[not] restrict employees' rights by creating excessively broad job descriptions." *Id.*; *see also Lane v. Franks*, 573 U.S. 228, 240 (2014) (The "critical question under *Ceballos* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

---

[1] The Ninth Circuit applies the analysis from *Pickering* "regardless of the reason an employee believes his or her speech is constitutionally protected," including if it is religious speech that also implicates the Free Exercise Clause. *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 650 (9th Cir. 2006); *see also Knight v. Connecticut Dep't of Pub. Health*, 275 F.3d 156, 167 (2d Cir. 2001) (reaching same conclusion). That said, Kennedy alleges a distinct claim based on the Free Exercise Clause challenging the District's directive barring Kennedy's practice of praying in view of students. Complaint, Dkt. # 1, at 14. While there is substantial overlap between these claims, unlike *Berry* and *Knight*, Kennedy does not allege a "hybrid" free speech/free exercise claim. *See Berry*, 447 F.3d at 649 n.5; *Knight*, 275 F.3d at 166. Kennedy's free exercise claim is sufficiently distinct from his free speech claim to warrant separate analysis under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

1    The Ninth Circuit has interpreted *Ceballos* as presenting courts with a "mixed question of

2    fact and law" regarding the nature of a public employee's speech. *Posey v. Lake Pend Oreille*

3    *Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008). First, the trier or fact must determine the

4    "scope and content of a plaintiff's job responsibilities;" then, "the court must "evaluate the

5    ultimate constitutional significance of the facts as found." *Id*. (partly quoting *Bose Corp. v.*

6    *Consumers Union of United States, Inc.*, 466 U.S. 485, 501 n.17 (1984)). If the employee's

7    speech is "the product of performing the tasks the employee was paid to perform" or "owes its

8    existence to [their] professional responsibilities," then they spoke in their capacity as a public

9    employee and their speech is unprotected. *Eng*, 552 F.3d at 1071 (quoting *Posey v. Lake Pend*

10   *Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008) and *Ceballos*, 547 U.S. at 421,

11   respectively) (internal quotation omitted).

12       In *Johnson v. Poway Unified School District*, 658 F.3d 954 (9th Cir. 2011), the Ninth

13   Circuit applied this framework to teachers and defined the scope of their duties with respect to

14   student-directed speech. Johnson, a high school math teacher, had decorated his classroom using

15   two banners with religious messages, such as "IN GOD WE TRUST." *Id*. at 958. The court

16   concluded that Johnson's duties encompassed such communications because the school had a

17   specific policy regulating the content of classroom banners and because "expression is a

18   teacher's stock and trade, the commodity she sells to her employer in exchange for a salary." *Id*.

19   at 967. The court thus held that, "*as a practical matter*, we think it beyond possibility for

20   fairminded dispute that the 'scope and content of [Johnson's] job responsibilities' did not include

21   speaking to his class in his classroom during class hours." *Id*. (quoting *Ceballos*, 547 U.S. at

22   424).

23

24

The court then assessed the constitutional significance of these facts and held that Johnson's speech owed its existence to his position, despite the fact that the banners' messages were outside the math curriculum. *Id*. at 967-68. The court pointed out that "[a]n ordinary citizen could not have walked into Johnson's classroom and decorated the walls as he or she saw fit." *Id*. at 968. More broadly, "because of the position of trust and authority they hold and the impressionable young minds with which they interact, teachers *necessarily* act as teachers for purposes of a *Pickering* inquiry when at school or a school function, in the general presence of students, in a capacity one might reasonably view as official." *Id*.

It was *Johnson* that the Ninth Circuit primarily relied upon in upholding this Court's order denying a preliminary injunction. *Kennedy I*, 869 F.3d at 824-25. Just as Johnson was tasked with educating his students in the classroom, the appellate court determined that Kennedy's job was to serve as a role model and mentor on the field. *Id*. at 825. Consequently, "[w]hen acting in an official capacity in the presence of students and spectators, Kennedy was also responsible for communicating the District's perspective on appropriate behavior through the example set by his own conduct." *Id*. at 827. The court then held that Kennedy's prayer was a product of his coaching position because it took place "[1] at school or a school function, [2] in the general presence of students, [3] in a capacity one might reasonably view as official." *Id*. at 827 (quoting *Johnson*, 658 F.3d at 968). Further, the court noted that Kennedy's speech "owe[d] its existence" to the field-access provided by his coaching position and, as in *Johnson*, deemed the content of Kennedy's speech largely irrelevant. *Id*. at 827-28 (quoting *Ceballos*, 547 U.S. at 421-22).

Kennedy appealed again, and although the Supreme Court did not grant certiorari, four of the Justices criticized the Ninth Circuit's reasoning. *Kennedy II*, 139 S. Ct. at 635 (Alito, J.,

concurring). The Justices observed that the Ninth Circuit's application of *Ceballos* implies that teachers and coaches are "on duty" whenever students are nearby and can thus be fired for any expressive activity during the school day or at school events. *Id.* at 636. This could include a prayer before lunch or an innocuous comment that is overheard by students. *Id.* According to the four Justices, *Ceballos*'s holding does not reach so far. *Id.* at 636-37.

As this tension demonstrates, the question of what speech is public vs. private becomes especially difficult when an essential part of an employee's job *is* expression. On one hand, a coach or teacher's duties as an educator make it imperative that the school can control the types of information they impart to young minds. On the other hand, these broad duties could conceivably encompass all expression—no matter how personal—if there is a slight chance students could witness it. But while this case exists near the crossroads of these concerns, Kennedy's prominent, habitual prayer is not the kind of private speech that is beyond school control.

As the Ninth Circuit determined, Kennedy's duties as a coach "involved modeling good behavior while acting in an official capacity in the presence of students and spectators." *Kennedy I*, 869 F.3d at 826. The agreement Kennedy signed upon becoming a coach confirms this by requiring him to act as a "mentor and role model for the student athletes" and "exhibit sportsmanlike conduct at all times." Coaching Agreement, Dkt. # 64-2 at 11. Kennedy himself testified that what he says or does while coaching serves as an influential example for his players to "do what is right". Kennedy Dep., Dkt. # 64-24, at 109-110. A practical description of a coach's job responsibilities must account for this far-reaching influence.

This does not necessarily mean that *all* of a coach's conduct nearby student athletes is within the scope of their job. After all, as the four concurring Justices pointed out, such an

outcome could conceivably mean that a coach's speech is subject to control even off the clock. *Kennedy II*, 139 S. Ct. at 637 (Alito, J., concurring). There is a point at which an educator's speech is so obviously personal that it is delivered as a citizen. This may be the case when a coach greets family in the bleachers during a game or a teacher wears a cross around their neck. *See* District 30(b)(6) Dep., Dkt. # 71-9, at 125-26; *see also* Boynton Dep., Dkt. # 71-7, at 19-21 (testifying that BHS coaches would sometimes check their phones or greet friends and family in the stand after games).[2] Although students may glimpse such expression from time to time, contextual cues will alert them that the conduct is private and not intended to influence them.

But just as it would excessively restrict public educators to encompass all speech within the scope of their duties, it would be equally harmful to exclude all speech that is not overtly educational. Speech around students bearing the mark of an educator's formal role, such as a classroom banner, is well within the scope of their responsibilities. *See Johnson*, 658 F.3d at 958. To hold otherwise would hinder schools' ability to protect students from all sorts of improper communications by teachers and coaches that happen to occur outside of a lesson. Consequently, while Kennedy's job description is broad, it nonetheless captures the reality that educators are entrusted with shaping students while on duty.

Given this practical assessment of Kennedy's duties as a coach, the Court must hold that his prayers at the 50-yard line were not constitutionally protected. "[T]eachers necessarily act as teachers for purposes of a *Pickering* inquiry when [1] at school or a school function, [2] in the

---

[2] Kennedy claims that the Ninth Circuit determined the scope of a coach's duties based on an incomplete record in *Kennedy I*. Kennedy Motion, Dkt. # 70, at 13. But the only additional evidence that Kennedy identifies is the deposition testimony of the District and Coach Boynton that a coach would not be disciplined for placing a brief call or greeting family while on duty. The fact that some specific speech would not lead to discipline does not necessarily mean it is delivered in a private capacity. But more importantly, this limited new evidence does not mean the record before the Ninth Circuit was fatally inadequate on this issue.

general presence of students, [3] in a capacity one might reasonably view as official." *Kennedy I*, 869 F.3d at 827 (quoting *Johnson*, 658 F.3d at 968). It is the third requirement that Kennedy contests,[3] but his speech simply cannot be compared to an impromptu phone call, greeting family in the bleachers, or even quickly bowing one's head before a meal. *See Kennedy II*, 139 S. Ct. at 636 (Alito, J., concurring). Like the front of a classroom or the center of a stage, the 50-yard line of a football field is an expressive focal point from which school-sanctioned communications regularly emanate. If a teacher lingers at the front of the classroom following a lesson, or a director takes center stage after a performance, a reasonable onlooker would interpret their speech from that location as an extension of the school-sanctioned speech just before it. The same is true for Kennedy's prayer from the 50-yard line.

Kennedy testified that, despite his prominent location on the field, his prayers were between him and God and not directed at players or audience members. Kennedy Dep. at 27. This may be true as far as Kennedy is concerned, but the *Ceballos*/*Eng* analysis is not so subjective. If it was, a teacher could validly claim that their sincerely-held beliefs compel them to announce their prayers after each lesson or proselytize in front of students. The teacher may not *intend* to direct their actions at the students, but the latter would nonetheless feel implicated. Kennedy's prayers at the center of the field, under bright lights, in front of the bleachers, at a time when the general public could not access the field had a similar effect.

Kennedy's speech at the 50-yard line also "owes its existence" to his coaching position. *Ceballos*, 547 U.S. at 421. As the Ninth Circuit observed, this is literally the case because only

---

[3] Although Kennedy originally claimed to be off duty after games, he has now abandoned that contention. *See* October 14 Letter, Dkt. # 71-16, at 2. All of the evidence, including Kennedy's own testimony, confirms that his job responsibilities extended at least until the players were released after going to the locker room. Kennedy Dep., Dkt. # 64-24, at 41-42; October 23 Letter, Dkt. # 64-14, at 1; Polm Dep., Dkt. # 64-25, at 47.

BHS staff and players had access to the field immediately after football games. *Kennedy I*, 869 F.3d at 827. However, as the Court explained in *Ceballos*, presence in an exclusive location is insufficient on its own to expose an employee's speech to restriction. *See* 547 U.S. at 421 ("Many citizens do much of their talking inside their respective workplaces."). Here, however, Kennedy's speech was uniquely tied to his job. Kennedy's sincerely-held beliefs did not allow him to pray just anywhere about anything; he was required to pray on school-controlled property about a school-sponsored event. The place and manner of Kennedy's speech also gave it a unique effect that derived from his position. Just as the impact of Ceballos's memo depended on his authority and duties as a prosecutor, the impact of Kennedy's prayer came from his position as a coach. *See id*. at 414, 420.

And indeed, whether Kennedy intended it or not, his prayers did have an impact: players joined Kennedy at the 50-yard line for years despite evidence that some would not have done so if Kennedy were not a coach. Kennedy Dec., Dkt. # 71-4, at 2-3; Barton Dec., Dkt. # 65, at 2; Leavell Dec. at 7; Polm Dep., Dkt. # 64-25, at 73-74; *see also* Saulsberry Dep., Dkt. # 64-26, at 19-20. He may not have been teaching his players to block and tackle, but Kennedy's highly visible prayers were similarly influential on players' conduct. Because he was hired precisely to occupy this type of influential role for student athletes, Kennedy spoke in his capacity as a public employee and his § 1983 free speech claim fails as a result.

**b.      *Whether the District's Actions were Adequately Justified***

The fact that Kennedy spoke as an employee is enough to end the Court's analysis at part two of the *Eng* inquiry. *Johnson*, 658 F.3d at 961. However, the District's justification for disciplining Kennedy—avoiding an Establishment Clause violation—is so closely related to the public nature of Kennedy's speech and his remaining claims that it warrants discussion.

"Establishment Clause concerns can justify speech restrictions 'in order to avoid the appearance of government sponsorship of religion.'" *Hills v. Scottsdale Unified Sch. Dist. No. 48*, 329 F.3d 1044, 1053 (9th Cir. 2003) (quoting *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979, 983-85 (9th Cir.2003)). Indeed, "a state interest in avoiding an Establishment Clause violation 'may be characterized as compelling.'" *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) (quoting *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)).

As the Supreme Court has recognized numerous times, "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee v. Weisman*, 505 U.S. 577, 592 (1992) (collecting cases). *Santa Fe Independent School District v. Doe* is particularly instructive here. 530 U.S. 290 (2000). The policy in *Santa Fe*, which was adopted by a majority of the student body, allowed a student-led prayer to be delivered via the high school's announcement system before football games. *Id.* at 297-99. The Court held the policy unconstitutional because it amounted to government endorsement of religion and coerced participation in religious activity.[4] *Id.* at 309, 312.

Under the endorsement test, the court must ask "whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it

---

[4] Kennedy argues that *Santa Fe*'s holding was based solely on the coercive effects of the school's prayer announcement policy. Kennedy Opposition, Dkt. # 83, at 6. The Court disagrees. *Santa Fe* expressly held, "[T]he simple enactment of this policy, with the purpose and perception of school endorsement of student prayer, was a constitutional violation." 530 U.S. at 316. Indeed, in justifying its holding, *Santa Fe* quoted O'Connor's concurrence in *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) identifying the endorsement test. *Santa Fe*, 530 U.S. at 309-10. Other courts in this circuit have also applied both the endorsement and coercion tests in cases involving religious expression in schools. *See, e.g., Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1017 (9th Cir. 2010); *Kennedy I*, 869 F.3d at 834 (Smith, J., concurring). To the extent that Justice Kavanaugh's concurrence in *American Legion v. American Humanist Association*, 139 S. Ct. 2067, 2093 (2019) cabins the Establishment Clause analysis in school prayer cases to the coercion test, the Court declines to follow this non-binding dicta.

as a state endorsement of [religion]." *Id*. at 308 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 76 (1985) (O'Connor, J., concurring in the judgment)). The prayer, which was delivered "over the school's public address system, by a speaker representing the student body, under the supervision of school faculty, and pursuant to a school policy that explicitly and implicitly encourages public prayer," created the perception of school sponsorship. *Id*. at 310. The coercion test asks simply whether students are somehow forced to "support or participate in religion or engage in a religious exercise." *Newdow v. Rio Linda Union Sch. Dist.*, 597 F.3d 1007, 1038-39 (9th Cir. 2010) (citing *Lee*, 505 U.S. at 592). The *Santa Fe* Court determined that the policy was coercive because it used the "immense social pressure" associated with high school football games to "exact religious conformity" from those in attendance. *Id*. at 311-12 (quoting in part *Lee*, 505 U.S. at 596).

Other circuit courts have similarly recognized the potential for Establishment Clause violations when school employees become involved in religious expression. In *Doe v. Duncanville Independent School District*, for example, the Fifth Circuit held that school staff participating in student-led prayer at basketball games "improperly entangle[d] [the school] in religion and signal[ed] an unconstitutional endorsement of religion." 70 F.3d 402, 406 (5th Cir. 1995). And in *Borden v. School District of the Township of East Brunswick*, the Third Circuit held that a coach bowing his head and taking a knee to join his players in prayer before games violated the Establishment Clause. 523 F.3d 153, 179 (3d Cir. 2008). Although the court noted that the result might be different if the practice was viewed in isolation, the coach's years-long history of *leading* prayers with athletes would cause a reasonable observer to perceive school endorsement of religion. *Id*. at 177-78.

Here, Kennedy's practice of praying at the 50-yard line fails both the endorsement and coercion tests and violates the Establishment Clause.[5] While it may not convey school approval as universally as a public announcement system, speech from the center of the football field immediately after each game also conveys official sanction. This is even more true when Kennedy is joined by students or adults to create a group of worshippers in a place the school controls access to. Kennedy argues that he "intentionally avoided organizing prayer with others" after the District's September 17 letter, but the publicity surroundings his prayer and its prominent location made explicit invitations unnecessary. *See* Kennedy Dec., Dkt. # 71-4, at 3 (noting that his prayers on the field drew players to join over time); Photo of October 16 Game, Dkt. # 64-13 (showing Kennedy praying with players and members of the public). Indeed, at the very last game before Kennedy's suspension, a group of adults went to the center of the field to pray with him. Video of October 26 Game, Dkt. # 71-22. At no time did Kennedy, through words or actions, ensure that others would not amplify his religious message on the field.

And even if the District did not have an official policy condoning Kennedy's conduct, as in *Santa Fe*, a reasonable observer would conclude the school was aware that a "distinctively Christian prayer" was taking place and had chosen to allow it. *See Kennedy I*, 869 F.3d at 835 n.3 (observing that non-Christian religions employ different poses for worship). The risk of that perception is certainly higher here than in *Duncanville* and *Borden*, where school staff merely participated in prayer rather than initiating it themselves. *Duncanville*, 70 F.3d at 406; *Borden*, 523 F.3d at 176. And like those cases, Kennedy's role as a representative of the District makes

---

[5] Some courts have employed the test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971) in cases involving religious conduct at schools. *See, e.g., Newdow*, 597 F.3d at 1076. Kennedy argues that the *Lemon* test is disfavored and does not apply in the school. The Court need not address this because the endorsement and coercion tests are more readily applicable to the issues here and are sufficient to resolve them.

disclaimers an inadequate remedy. *Duncanville*, 70 F.3d at 406; *Borden*, 523 F.3d at 177 n.20; *see also Kennedy I*, 869 F.3d at 836 (Smith, J., concurring).

Observers would also be aware that Kennedy's activities were religious in nature based on his history of engaging in religious activity with players. For eight years prior to 2015, Kennedy prayed with students in the locker room, prayed on the field, and delivered religious inspirational talks after games. Kennedy Dec., Ex. 71-4, at 3-4. Anyone familiar with this history would view Kennedy's prayer at the 50-yard line as continuing this tradition of injecting religious undertones into BHS football events.

But even more than the perception of school endorsement, the greatest threat posed by Kennedy's prayer is its potential to subtly coerce the behavior of students attending games voluntarily or by requirement. Players (sometimes via parents) reported feeling compelled to join Kennedy in prayer to stay connected with the team or ensure playing time, and there is no evidence of athletes praying in Kennedy's absence. Leavell Dec., Dkt. # 67, at 7; Barton Dep., Dkt. # 65, at 2; Polm Dep., Dkt. # 64-25, at 73-74; Saulsberry Dep., Dkt. # 64-26, at 19-20. Kennedy himself testified that, "[o]ver time, the number of players who gathered near [him] after the game grew to include the majority of the team." Kennedy Dec., Dkt. # 71-4, at 3. This slow accumulation of players joining Kennedy suggests exactly the type of vulnerability to social pressure that makes the Establishment Clause vital in the high school context. As anyone who has passed through that fraught stage of life can confirm, there is no time when the urge to join majority trends is greater. But when it comes to religion, the Establishment Clause forbids government actors from using this pressure to promote conformity.

Kennedy argues that his prayers were not coercive because, after the District's September 17 directive, he "intentionally separated himself from students and waited until players were

departing the field before engaging in prayer." Kennedy Motion, Dkt. # 70, at 18; *see also* Kennedy Dep., Dkt. # 64-24, at 62-66 (explaining that, after the September 17 letter, Kennedy and his lawyers planned for him to pray quickly at the 50-yard line while students were distracted by singing the fight song). However, even if the Court focuses only on Kennedy's final few games, the outcome is the same. Kennedy may have tried to deliver his prayers in late 2015 while players were distracted, but this does not mean the athletes were unaware of Kennedy's actions or could not have joined him. His brief prayers were still long enough for other adults to participate at the October 16 and 26 games, and Kennedy's original practice of praying alone on the field eventually drew in most of the team.

Indeed, Kennedy's post-September 17 prayers were not meaningfully different from his original practice before he started giving inspirational speeches. Kennedy's own statements have consistently represented his plan for the October 16, 23, and 26 games as a continuation of what he "started out doing." Kennedy Dep. at 64; October 14 Letter, Dkt. # 71-16, at 6; Local News Video, Dkt. 64-12. Kennedy took no reliable steps to prevent students from joining him in prayer and has admitted that he would not have stopped them if they had. Kennedy Dep. at 65-66. The injunctive relief Kennedy requests, which would permit him to pray "at the 50-yard line at the conclusion of BHS football games" with no other limitations, reflects this. Complaint, Dkt. # 1, at 16. There is thus no assurance that, if Kennedy were allowed to resume his post-game prayers, students would not become involved again. This would be constitutionally unacceptable, as it would be impossible to tell which players joined out of genuine desire and which felt pressured.

Finally, Kennedy's own intentions also do not change the practical effects of his prayer. Kennedy occupied a powerful position in his players' lives, both as a role model and as one of the people controlling their chance to perform on the biggest stage American high schools have

to offer: the football field. Kennedy Dep., Dkt. # 64-24, at 106 (acknowledging that coaches can be the most important figure in some student athletes' lives). As Judge Smith observed in his concurring opinion, there is "no reason to believe that the pressure emanating from [Kennedy's] position of authority would dissipate" simply because he may have intended it to. *Kennedy I*, 869 F.3d at 835. Rather, Kennedy's prayers sent a "message to members of the audience who are nonadherents that they are outsiders, not full members of the political community." *Id.* (quoting *Santa Fe*, 530 U.S. at 309). For many young athletes, the response to such a message is a desire to become an insider by joining Kennedy at the 50-yard line. This coercive effect violates the Establishment Clause and justifies the District's decision to place Kennedy on leave.

**3.    Section 1983 Free Exercise Claim**

In addition to his free speech claim, Kennedy also makes a § 1983 claim under the Free Exercise Clause. "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral, . . . and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *see also Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 883 (1990). "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. at 533.

Kennedy contends that the District's September 17 directive, which derived from Board Policy 2340, was not neutral or generally applicable because it specifically targeted Kennedy's religious conduct. *See* September 17 Letter, Dkt. # 64-8. But even if this is the case, the District's decision to restrict Kennedy's post-game prayer activities was not unconstitutional under the standard from *Lukumi*. The District had a compelling interest in avoiding constitutional

violations, *see Good News Club*, 533 U.S. at 112, and the Court has already concluded that allowing Kennedy to continue praying at the 50-yard line would have violated the Establishment Clause. The District's application of Board Policy 2340 to Kennedy was also narrowly tailored to protect his rights. The District gave Kennedy multiple options to continue praying after games that would not have amounted to a violation. Kennedy, however, rejected these accommodations and did not respond to the District's requests for further input. In light of this, Kennedy's Free Exercise claim cannot succeed.

## 4. Title VII Claims

Finally, Kennedy asserts five claims under Title VII of the Civil Rights Act of 1964 related to his suspension: failure to re-hire (42 U.S.C. § 2000e–2(a)(1)), protected characteristic (§ 2000e–2(m)), disparate treatment (§ 2000e–2(a)), retaliation (§ 2000e-3(a)), and failure to accommodate (§§ 2000e-2(a) & 2000(j)). Kennedy Motion, Dkt. # 70, at 22-23. Congress passed Title VII to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification," such as religion. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1993). However, in Kennedy's case, there is no evidence that the District's actions were motivated by anything other than a desire to avoid constitutional violations.

### a. *Failure to Re-Hire Motivated by Protected Characteristic*

Kennedy asserts that the District failed to re-hire him on the basis of his religious beliefs, although his actual claim is that the District made it futile for him to re-apply for his job after they suspended him and issued critical evaluations. Complaint, Dkt. # 1, at 16. Title VII makes it unlawful for employers to "fail or refuse to hire or to discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

1    A 1991 amendment to the statute further provides that "an unlawful employment practice

2    is established when the complaining party demonstrates that race, color, religion, sex, or national

3    origin was a motivating factor for any employment practice, even though other factors also

4    motivated the practice." § 2000e-2(m).[6] Thus, even if the employer's action had other, non-

5    discriminatory motivations, they can still be liable if the employee's protected characteristic was

6    also a motivation. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 848 (9th Cir. 2002). It is also not

7    necessary under Title VII that an employee actually suffer a rejection if a negative outcome is

8    preordained. *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 762 (9th Cir. 1980) ("When a

9    person's desire for a job is not translated into a formal application solely because of his

10   unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who

11   goes through the motions of submitting an application."). To establish a prima facie case under

12   Title VII, a plaintiff need only present direct or indirect evidence creating an inference of

13   discrimination. *Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir.

14   2003).

15       Even under these forgiving standards, Kennedy's claim cannot pass scrutiny. There is no

16   evidence that Kennedy's religion itself, rather than the unconstitutional time and manner he

17   expressed it, motivated the District's actions. All the evidence shows that the District wanted to

18   accommodate Kennedy's faith and encouraged constitutional religious expression. Indeed, the

19   centerpiece of Kennedy's § 1983 claims is the assertion that he was placed on leave "solely

20

21   _____

     [6] Kennedy alleges separate claims for failure to re-hire and protected characteristic as a

22   motivating factor. Complaint, Dkt. # 1, at 15-16. But § 2000e-2(m) actually modified the
     definition of an "unlawful employment practice" as identified in § 2000e-2(a). *See Costa v.*

23   *Desert Palace, Inc.*, 299 F.3d 838, 848 (9th Cir. 2002). In light of this, the Court will address
     Kennedy's failure to re-hire claim under this more plaintiff-friendly inspirational definition

24   described in § 2000e-2(m) rather than addressing the claims separately.

[because of] concern that [his] conduct might violate the constitutional rights of students and other community members." Kennedy Motion, Dkt. # 70, at 9 (quoting Leavell Dep., Dkt. # 71-9, at 197). Kennedy's effort to equate the District's good faith efforts to obey the Establishment Clause with religiously-motivated discrimination cannot amount to a prima facie case of discrimination.

### b.    *Disparate Treatment*

Kennedy also asserts a disparate treatment claim based on the theory that the District targeted Kennedy for his demonstrative religious expression while failing to discipline other coaches who acted similarly. Complaint, Dkt. # 1, at 14. To succeed in a disparate impact claim, the plaintiff employee must first make a prima facie case by showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 656 (9th Cir. 2006). Then, the burden shifts to the defendant employer to provide a "legitimate nondiscriminatory reason" for the action.[7] *Id*. If they succeed in this, the plaintiff again has the burden of demonstrating that the defendant's reason is actually pretextual. *Id*. (citing *McDonnell Douglas*, 411 U.S. at 804).

---

[7] For Title VII theories other than disparate impact, § 2000e-2(m) establishes that an employer can still be liable even if they had an additional, non-discriminatory reason for their action if a protected characteristic was one of the motivating factors. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 848 (9th Cir. 2002) ("[I]f the employee succeeds in proving only that a protected characteristic was one of several factors motivating the employment action, an employer cannot avoid liability altogether, but instead may assert an affirmative defense to bar certain types of relief by showing the absence of 'but for' causation."). However, § 2000e-2(k) contains its own definition of an "unlawful employment practice" for disparate impact claims: "An unlawful employment practice based on disparate impact is established under this subchapter *only* if . . . a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin *and* the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." (emphasis added). This supersedes the

Here, Kennedy cannot carry his initial burden because he cannot show that anyone outside his class engaged in comparable conduct. Kennedy contends that other coaches on the team "similarly situated" to him were not disciplined for expressive activity like tying their shoes. But "[o]ther employees are similarly situated to the plaintiff when they have similar jobs and display *similar conduct*." *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1114 (9th Cir. 2011) (emphasis added). Tying one's shoes is in no way similar to demonstrative religious worship in the center of the field.

Kennedy argues that, under *Berry*, the Court should compare "Kennedy's brief, personal conduct [to the] brief, personal conduct of the other football coaches." Kennedy Opposition, Dkt. # 83, at 20. In *Berry*, the court compared the plaintiff's request to use a conference room for religious purposes to another group's request to use the room for secular purposes. 447 F.3d at 656. But unlike *Berry*, Kennedy's use of the center of the field to pray after each game is not the same as other coaches' spontaneous personal acts somewhere else on the field. The Court also rejects the notion that the District must treat religious expression the same as non-religious expression when there are no constitutional liabilities for the latter. *Berry* recognized this distinction as well. *Id*. at 656 ("[W]e perceive a difference between business-related social functions and religious meetings.").

The only evidence of a coach doing anything remotely comparable to praying on the 50-yard line is Kennedy's testimony that Coach Boynton engaged in silent Buddhist chants on the field after "many" BHS games. Kennedy Dec., Dkt. # 71-4, at 4; *see also* Kennedy Dep., Dkt. # 64-24, at 148. Boynton testified about one occurrence when he went onto the field after

definition in § 2000e-2(m) (which only applies "[e]xcept as otherwise provided in this subchapter") and allows employers a complete defense if they can demonstrate a legitimate non-discriminatory basis for the action.

the last game of his first season, took a picture of the scoreboard, and said a silent chant to himself while standing. Boynton Dep., Dkt. # 64-23, at 54-57. The District was not aware of any religious conduct by Boynton until Kennedy mentioned it in his EEOC complaint. Leavell Dec., Dkt. # 67, at 7. Kennedy himself admits that he would not have known that Boynton was engaging in Buddhist prayer at games because the only indication was that he sometimes closed his eyes briefly. Kennedy Dep. at 149-151. The fact that no one would have learned of Boynton's conduct if he had not said something himself confirms that it is not analogous to Kennedy's demonstrative prayer.

But even if it was, the District had a legitimate, non-discriminatory reason for placing Kennedy on leave: avoiding a constitutional violation. The undisputed evidence demonstrates that this was the District's rationale, and Kennedy presents no evidence that the District's actions were merely pretext to punish him for his religion. In fact, Kennedy argues that the District's rationale of avoiding liability was "consistent with [its] representations to both the public and the federal government." Kennedy Motion, Dkt. # 70, at 9. Kennedy's disparate treatment claim therefore fails.

*c.* **Failure to Accommodate**

Kennedy next claims that the District failed to accommodate his sincerely-held religious beliefs by putting restrictions on his post-game prayers. To succeed in a failure to accommodate claim, a plaintiff must show that: "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Berry*, 447 F.3d at 655 (quoting *Peterson v. Hewlett–Packard Co.*, 358 F.3d 599, 606 (9th Cir.2004)). The burden then shifts to

the defendant employer, who must demonstrate that "it initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* (quoting *Peterson*, 358 F.3d at 606).

Although Kennedy makes a prima facie showing that the District failed to accommodate him, the accommodation Kennedy demanded would have been an undue hardship for the District because it violated the Establishment Clause. As expressed in his October 14, 2015 letter, the accommodation Kennedy requested was unfettered freedom to "continue his practice of saying a private, post-game prayer at the 50-yard line," possibly with a disclaimer that his speech was private. October 14 Letter, Dkt. # 71-16, at 6. This would have violated the Establishment Clause, and Kennedy did not respond to the District's efforts to find a constitutional accommodation.

Kennedy now tries to argue that the District's September 17 letter was an acceptable accommodation allowing him to pray on the field away from students that the District deviated from later in its October 23 letter. Kennedy Motion, Dkt. # 70, at 23. This distinction, while convenient for Kennedy, is not supported by the record. First, the District's September 17 letter did not explicitly address Kennedy's 50-yard line prayers because they had by then "evolve[ed] organically" into inspirational talks with religious undertones. Dkt. # 64-8 at 1. Even so, the letter broadly stated, "Student religious activity must be entirely and genuinely student-initiated, and may not be suggested, encouraged (or discouraged), or supervised by any District staff." *Id.* at 3. Kennedy himself interpreted this as a direction to "cease" his "private religious activity . . . [of] walk[ing] to the 50-yard line and pray[ing]." October 14 Letter, Dkt. # 71-16 at 1; *see also* Kennedy Dep., Dkt. # 64-24, at 38-39 (testifying that Leavell made the District's position about

the prayer "very clear" and that Kennedy "agreed to stop the post-game prayers"). The District never offered to let Kennedy pray at the 50-yard line immediately after games.

Even if it had, any arrangement in which Kennedy prayed at the center of the field, immediately after games, in the presence of students would have run afoul of the Establishment Clause. Short of requiring Kennedy to pray out of students' sight, the only way to ensure Kennedy's prayers remained "separate from any student activity" was to forbid students from joining. September 17 Letter, Dkt. # 64-8 at 3. This, however, was also unacceptable to Kennedy because it would have infringed on the rights of students.[8] October 14 Letter, Dkt. # 71-16, at 5-6; *see also* Kennedy Dep., Dkt. # 64-24, at 65-66 ("I wasn't going to stop my prayer because there was kids around me."). There was thus no constitutional option for the District besides trying to find a way for Kennedy to pray privately after games. Because the District made several good-faith attempts to reach such an arrangement with Kennedy,[9] his Title VII claim fails.

*d.*   ***Retaliation***

Finally, Kennedy claims that the District retaliated against him for obtaining counsel and exercising his rights under the First Amendment. "To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected

---

[8] At his deposition, Kennedy admitted that he likely would have accepted an accommodation that allowed him to pray on the field during the window of time when students were on their way to the bus or on their way to the locker room. Kennedy Dep., Dkt. # 71-10, at 47-49. However, Kennedy never reached out to the District to discuss such an accommodation, *id.* at 47, and his October 14 letter made clear that he wished to resume his former practice of prayer. Dkt. # 71-16 at 6. The Court therefore need not decide whether such an arrangement would have complied with the Establishment Clause.

[9] Kennedy claims that the District never offered to allow him to pray on the field after the students had left. But in his deposition, Principal Polm testified that he offered just such an accommodation to Kennedy. Polm Dep., Dkt. # 64-25, at 46-49. Kennedy himself returned to the field on September 18, waited for the stadium to empty, and prayed on the field. Kennedy Dec., Dkt. # 71-4, at 5. Regardless, this dispute is not material because Kennedy did not respond to the District's good faith efforts to reach an accommodation.

him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). "If a plaintiff has asserted a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision." *Id*. The plaintiff then must prove that the defendant's reason is mere pretext. *Id*.

As with Kennedy's other Title VII claims, the fact that his prayers on the 50-yard line violated the Establishment Clause is fatal. By unilaterally rejecting the District's September 17 directive, stoking media attention, and continuing his unconstitutional manner of prayer, Kennedy did not engage in "protected activity." The District's decision to place Kennedy on leave and issue evaluations critical of his non-cooperative choices was also justified by its desire to avoid liability under the Establishment Clause. Kennedy's retaliation claim therefore fails.

## CONCLUSION

While public schools do not have unfettered discretion to restrict an employee's religious speech, they do have the ability to prevent a coach from praying at the center of the football field immediately after games. The Court GRANTS the District's Motion for Summary Judgment and DENIES Kennedy's Motion.

IT IS SO ORDERED.

Dated this 5th day of March, 2020.

Ronald B. Leighton
United States District Judge